*303
 
 MOORE, J.
 

 | ,This is an appeal from the Office of Worker’s Compensation, District 1-West, Claiborne Parish, the Honorable Carey Holliday presiding. The court granted Pinnergy’s motion for summary judgment dismissing the plaintiffs claim for compensation benefits on grounds that the claimant made false statements for the purpose of obtaining benefits. La. R.S. 23:1208. The plaintiff filed this appeal. For the following reasons, we affirm.
 

 FACTS
 

 Plaintiff, Ronald Johnson, received a minor abrasion to the cornea of his right eye when drilling mud splashed under his goggles on January 29, 2009. He was working for the defendant, Pinnergy, Ltd., as a truck driver at the time of the accident, which occurred while the drilling mud was being filled in his truck. Johnson was treated that day by Work Fit and examined the next by an optometrist, Dr. Spur-lock, who treated and released Johnson to restricted duty for two days. The claimant worked two days, but continued to complain. Over the next few weeks, despite receiving treatment and successive medical releases to return to full duty from several physicians, including ophthalmologists, Johnson failed to return to work for over one month. He was subsequently terminated from his employment for absenteeism.
 

 Mr. Johnson filed for unemployment benefits, but was denied per ruling by an Administrative Law Judge, who found that Johnson was correctly fired for cause. Johnson then filed a disputed claim for Worker’s Compensation benefits (Form 1008), alleging that no wage benefits had | abeen paid, and he was entitled to penalties and attorney fees.
 

 After deposing Johnson, Pinnergy moved for summary judgment on grounds that (1) Johnson forfeited his rights to benefits for making false statements for the purpose of obtaining benefits; (2) Johnson was not entitled to benefits because he was not disabled from work for more than 7 days before receiving a medical release to return to full duty; and, (3) Johnson had no proof that his eye problems were causally related to the accident. Following a contradictory hearing on the motion for summary judgment, the court granted the motion and dismissed the claim under La. R.S. 23:1208, i.e., finding that Johnson made false statements for the purpose of obtaining worker’s compensation benefits. The court also noted that it would deny the claim on the merits, commenting that one ophthalmologist who treated Johnson flatly stated that Johnson was malingering.
 

 The false statements were made while Johnson was being deposed. Johnson had seen an eye doctor, Dr. Gilcrease, four times in the weeks immediately prior to the alleged accident with similar eye complaints (blurred vision, eye pain and throbbing), the last time being just two days prior to the accident on January 29, 2009. However, when he was deposed under oath, Johnson unequivocally stated that he had only been to an eye doctor once since he was hired by Pinnergy on October 12, 2008, and that visit was for a routine eye examination. He stated that he did not know when he had seen the eye doctor, but indicated that the visit was not recent or near the time of the accident. Johnson also denied that he had any | ¡¡previous eye problems other than occasional allergies. On the contrary, he had actually sought and obtained medical treatment since 2007 complaining of essentially the same problems he now alleges were caused by the accident.
 

 Johnson now appeals alleging that the trial court erred in finding that Johnson
 
 *304
 
 forfeited his rights to compensation benefits under La. R.S. 23:1208. Specifically, he argues that he did not understand the deposition question due to his alleged diminished mental capacity. Additionally, Johnson contends that the court erred in allegedly finding that his medical condition had resolved and erred in failing to consider alleged medical evidence that shows he is now blind in his right eye.
 

 DISCUSSION
 

 The motion for summary judgment is a procedural device to avoid a full-scale trial when there is no genuine issue of material fact.
 
 Kay v. Carter,
 
 243 La. 1095, 150 So.2d 27 (1963);
 
 Jones v. Airport Systems Int’l,
 
 28,278 (La.App. 2 Cir. 4/3/96), 671 So.2d 1176. Summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action, except certain domestic actions; the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966 A(2);
 
 Racine v. Moon’s Towing,
 
 2001-2837 (La.5/14/02), 817 So.2d 21. The motion should be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 |4B. Since the 1996 and 1997 amendments to Art. 966, the courts are to assess the proof submitted by the parties equally, without any presumption in favor of trial on the merits.
 
 Jones v. Estate of Santiago,
 
 2003-1424 (La.4/14/04), 870 So.2d 1002;
 
 Hardy v. Bowie,
 
 98-2821 (La.9/8/99), 744 So.2d 606. Appellate review of a grant or denial of a motion for summary judgment is
 
 de novo. Jones v. Estate of Santiago, supra.
 
 Summary judgment is seldom appropriate for determinations based on subjective facts of motive, intent, good faith, knowledge or malice, yet it may be granted on a subjective issue when no issue of material fact exists concerning that issue.
 
 Smith v. Our Lady of the Lake Hosp.,
 
 93-2512 (La.7/5/94), 639 So.2d 730;
 
 Brown v. International Paper Co.,
 
 38,892 (La.App. 2 Cir. 9/22/04), 882 So.2d 1228.
 

 The Workers’ Compensation Act imposes penalties for willfully making a false representation in connection with a compensation claim. La. R.S. 23:1208 provides, in pertinent part:
 

 A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
 

 [[Image here]]
 

 E. Any employee violating this Section shall, upon determination by workers’ compensation judge, forfeit any right to compensation benefits under this Chapter.
 

 The requirements for forfeiture of benefits are that (1) there is a false statement or representation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or defeating any benefit or payment.
 
 Brown v. International Paper Co., supra; Smalley v. Integrity Inc.,
 
 31,247 (La.App. 2 Cir. 12/9/98), 722 So.2d 332,
 
 writ denied,
 
 99-0072 (La.3/19/99), 739 So.2d 782. The employer is not required to show that it was prejudiced by the false statement or misrepresentation.
 
 Id.; Varnado v. Winn-Dixie La. Inc.,
 
 98-0301 (La.App. 1 Cir. 9/25/98), 720 So.2d 66.
 

 The question presented is whether the summary judgment evidence is sufficient to show that Johnson willfully made a misrepresentation or false statement in his deposition for the purpose of obtaining compensation benefits. Pinnergy does not
 
 *305
 
 contest that Johnson sustained a work-related abrasion to his eye on January 29, 2009. It contends that the medical evidence shows that this abrasion quickly healed and Johnson’s complaints, if real, are related to a preexisting eye condition for which Johnson made false statements in order to obtain worker’s compensation benefits. Accordingly, Pinnergy contests the allegation that the January 29, 2009 accident caused the injuries for which Johnson now seeks compensation benefits.
 

 Johnson’s primary argument is that it would be unfair to hold him responsible for making false statements because he did not understand the questions regarding his doctor visits due to diminished mental capacity. Therefore, he argues, he did not intend to make false statements. The submitted proof of his alleged diminished capacity is that he did not receive a high school diploma, but instead received a diploma for completion of an alternative program of study. Johnson’s counsel repeatedly referred to this diploma as a certificate for completion of a program in “special education.” However, there is actually no evidence that Johnson’s diploma indicates that | fihe was a special education student. Nor is there any evidence that Johnson suffers from diminished mental capacity.
 

 After review of the deposition testimony in question, we conclude that Johnson intentionally tried to conceal his preexisting eye problems and the prior medical treatment he received for it for the purpose of establishing a causal link between the accident and his eye problems in order to obtain compensation benefits. Regarding his eye problems prior to the accident, Johnson testified as follows:
 

 Q: Before January 29 of 2009, were you having any problems with your eyes?
 

 A: No other than the common, you know, allergies, you know. No injury, no — nothing else of that nature.
 

 Q: Were you ever having problems with either of your eyes where you felt like there was pain either in or behind your eye like you’re talking about now?
 

 A: No.
 

 Q: Were you having any problems with seeing spots or what the eye doctor sometimes calls floaters? Were you having any of that before this accident?
 

 A: Not that I can recall, no.
 

 Q: You didn’t have any?
 

 A: No.
 

 Q: Did you ever have any occasion where you felt like your eyes had a lot of pressure on them like a buildup of pressure either in or behind the eye?
 

 A: No.
 

 Q: Did you ever have any problem with seeing — we talked about floaters— either brown or black spots with either eye?
 

 A: No, no problems.
 

 |7Q: Were you having any problems with either eye, with either pain or throbbing in the year prior to the accident?
 

 A: No.
 

 Q: Did you ever have any problem where you had either a pulling or twitching sensation in either eye before this accident?
 

 A: I don’t recall, no.
 

 Johnson therefore unequivocally testified that he was not having eye problems before the accident and specifically denied having any of the same problems of pain, throbbing, floaters, spots, etc. prior to the accident. Johnson further testified:
 

 
 *306
 
 Q: You told me previously that you were seeing Dr. Gilcrease annually for just routine checkups on your eyes.
 

 A: Uh-huh. (Affirmative)
 

 Q: I think my doctor tells me every 18 months, but it may be different for me than you. When was the last time that you saw Dr. Gilcrease before this accident?
 

 A: Probably — I’m going to say when I was having the allergies I want to say. I’m not really quite sure, but I want to say that was around that time.
 

 Q: Around about that time?
 

 A: Yeah, when I was having, you know, just common allergies. That’s my doctor. That’s the one that I would-
 

 Q: Okay. So you would have seen Dr. — you were hired you said in October, 2008. Would you have seen an eye doctor between October of 2008 and January 29th of 2009 when you got hurt, an eye doctor?
 

 A. Would I have seen one?
 

 Q: Did you in fact see any eye doctors — I guess it’s Dr. Gilcrease, but it may be somebody else. Did you see any eye doctors between October of 2008 when you got hired by Pinnergy and the accident?
 

 Is A: Oh, yes.
 

 Q: Okay. How many times did you see an eye doctor for eye problems between when you got hired by Pin-nergy and the date of your on-the-job accident?
 

 A:- Run that by me again?
 

 Q: I think you told me — if I’m going back to my notes and got this written down correctly, you told me that you got hired on October 12th of 2008 and the date you got hurt, January 29th of 2009, how many times would you have seen an eye doctor in this three and a half months that you worked for Pinner-gy?
 

 A: For the accident or—
 

 Q: Well, you wouldn’t have seen him for the accident because the accident hadn’t happened yet. The accident hadn’t happened. I’m talking about after you got hired by Pinnergy—
 

 A: Oh, one.
 

 Q: —but before the accident how many times would you have seen an eye doctor?
 

 A: One
 

 Q: Okay. Do you know when you saw that eye doctor?
 

 A: I don’t. I sure don’t, no.
 

 Q: Okay. But you’re sure it’s only one time that you saw an eye doctor?
 

 A: Yes.
 

 Q: All right. It would have been Dr. Gilcrease?
 

 A: I believe so. Well, I’m going to say eye associates because sometimes you may go—
 

 Q: But you only — but you went to Dr. Gilcrease’s office? It may have been another doctor on call that day or what have you?
 

 A: Yeah, yeah.
 

 Q: I understand that, but you went to Dr. Gilcrease’s office?
 

 A: Yes.
 

 |aQ: How soon before the accident was that you went to Dr. Gilcrease’s office? Are we talking like in October or November, December, are we talking about 20 minutes before
 
 *307
 
 the accident? What are we talking about?
 

 A: Oh, no, I don’t remember the time, but it wasn’t — no, it wasn’t close. It wasn’t no—
 

 Q: It wasn’t just a matter of days before?
 

 A: No.
 

 In conflict with Johnson’s testimony, our review of Dr. Gilcrease’s medical records reveal that Mr. Johnson went to see Dr. Gilcrease four times between December 23, 2008 and January 27, 2009, complaining his eyes were burning, throbbing, tearing, blurring, itching, and pulling. Prior to those visits, Johnson saw Dr. Gilcrease several times in 2007 complaining of jumping, pressure, seeing black and brown spots, dryness, glare and that his glasses were too strong. We note that post-accident, Johnson’s complaints are much the same: glare, floaters, itching and burning, with the only difference is that Johnson now complains that the symptoms are the result of the January 29, 2009 accident.
 

 The medical evidence does not support this conclusion. After the accident, Johnson was sent to Dr. Spurlock, a doctor of optometry. Johnson complained of pain, throbbing, and pressure. In a follow-up shortly thereafter, Dr. Spurlock prescribed Tobramycin, which is used to treat conjunctivitis. Johnson then complained of seeing spots on February 9, 2009. Dr. Spurlock then referred Johnson to Dr. Lyon, an ophthalmologist and a specialist in trauma to the eye without any return appointment. Dr. Lyon examined Johnson twice. On February 9, 2009, Dr. Lyon concluded |inthat the corneal abrasion had healed nicely. Johnson has some slight swelling of his right eye lid, but he did not see any problems that would account for Johnson’s complaints. He noted that Johnson’s conjunctivitis was responding nicely to the treatment of Tobramycin. On February 12, Johnson went back to Dr. Gilcrease.
 

 Ultimately, Dr. Gilcrease referred Johnson to Dr. Thomas Parker, a medical doctor, who then referred Johnson to Dr. Garrett, a neuro-ophthalmologist. Dr. Garrett examined Johnson and concluded that Johnson was malingering. Johnson then went to the emergency room complaining that the eye drops Dr. Garrett put in his eyes irritated them. When personnel in the emergency room called Dr. Garrett, he told them that Johnson was a total fake and malingering.
 

 Johnson then went to see Dr. Thomas Dansby, a family practice physician, complaining that his eyes were irritated. Dr. Dansby treated Johnson for acute conjunctivitis and released him to return to work on February 26, 2009.
 

 The record shows several visits to the Minden Medical Center, where Johnson has made similar complaints, but also reported that he was blind in his right eye. These records show that Johnson was treated for conjunctivitis.
 

 CONCLUSION
 

 The record in this case supports the conclusion that Johnson had pre-existing medical problems, including recurring eye infections, which are not causally connected to the accident of January 29, 2009. Moreover, Johnson |, attempted to conceal this fact by intentionally making false statements regarding these prior symptoms and prior medical treatment at his trial deposition. We conclude that the worker’s compensation judge correctly granted Pinnerg/s motion for summary judgment.
 

 Accordingly, the judgment is affirmed at appellant’s cost.
 

 AFFIRMED.