DREW, J.
_JjIn this stockholder lawsuit concerning the closing of Transylvania Gin, Inc., Fair Farms, Inc.,[1] appeals a summary judgment granted in favor of defendants. Fair Farms also appeals a judgment granting the exception of prescription as to its negligence claims.
We reverse the summary judgment. We also reverse the granting of the exception of prescription insofar as it dismissed certain negligence claims. The matter is remanded for further proceedings.
FACTS
Transylvania Gin is a closely held corporation owned, at the filing of this suit, by eight stockholders. The stock was held in six blocks of 20 shares and two blocks of 10 shares. The stockholders and their interests were recorded for notice of the annual meeting in 2010, and this was the last record of stock ownership before the suit was filed. Ownership was as follows:
• Fair Farms, Inc. (formerly Scrapping Cotton, Inc.), represented by Robert A. Fairchild: 20 shares.
• JBF Partnership, represented by William Bradley Johnson: 20 shares.
• Robert B. Holt, Inc., represented by Robert B. Holt: 20 shares.
• Anthony Hal Waller: 20 shares.
• Boba, Inc., represented by Boyce Miller: 20 shares.
• Roy Dean Hart: 20 shares.
• John S. “Johnny” Johnson & Linda Johnson Green: 10 shares.
• Voncile Johnson: 10 shares.
|2The gin was traditionally run very informally, with no minutes from many meetings prior to 2009. The members of the gin’s board had allowed Robert Fair-child, who began serving as president of the gin in 1972, to have nearly total control over the gin, including buying and marketing cottonseed, for almost 40 years. The board raised no objection to the gin being run in this manner, and Fairchild said all stockholders had a vote in major decisions.
Beginning in December 2008, the stockholders became concerned about the decreasing availability of cotton in East Carroll Parish. The number of cotton acres farmed in East Carroll Parish had dropped during the period from 2005 through 2008. During this period, the number of bales ginned at Transylvania Gin had decreased 70%. A stockholders’ meeting was held in December 2008, during which the gin’s accountant, Alyssa Oliver, presented rough estimates of the potential costs for the 2009 ginning season.
To determine the income from ginning, she considered the potential for 3500 or 5000 bales of cotton available with a 1.3 seed factor and $180 per ton seed price. *27 Oliver then looked at the cost of ginning, using estimates of $53-55 per bale from historical cost estimates. After taking into account the costs of ginning and potential income, she estimated the net profit for the season, excluding rebates, repairs, and note payments. She believed the gin would have between $9,000 and $19,000 to spend on expenses after the costs of ginning were deducted. Robert Holt, secretary of the gin and the only person who spoke to Oliver about these projections |sprior to the meeting, provided the seed price and the number of bales used in Oliver’s estimates. Holt said in his deposition that as a stockholder he was entitled to request these calculations. He admitted that despite giving Oliver the numbers to determine the potential income for the 2009 season, he was not familiar with the “workout monies” method of payment that the gin typically used for receiving payment for cottonseed; he had, however, heard Fairchild mention “workout monies.” [2] This anticipated payment for cottonseed was, therefore, not considered in Oliver’s calculations.
The gin’s minutes indicate that at the next meeting the board agreed to decrease Fairchild’s salary by one-half and terminate the remaining employees.
At the following meeting, Fairchild informed the board that he did not agree with decisions made at the earlier meeting and submitted his resignation. The board voted not to accept his resignation, and many of the stockholders described a disagreement between Fairchild and Holt that abruptly ended the meeting.
Fairchild contended that he and Holt argued because Holt said he did not intend to grow cotton that season. Fairchild said he offered Holt $35,000 for his stock, and Holt countered that he wanted $100,000 for the stock; Holt denied that Fairchild offered him a price for his stock at that meeting.
At the next meeting on March 19, 2009, the board accepted Fairchild’s resignation. Brad Johnson became the gin’s president. At aRMarch 26, 2009, meeting, there was a vote to close the gin for that year’s ginning season, but the vote was subsequently delayed until the annual stockholders’ meeting. The stockholders voted to close the gin at this annual meeting. Hart, Fairchild, and Johnny Johnson were absent from the meeting. In June 2010, the board of directors voted to keep the gin closed for the 2010 ginning season. In 2011, the board of directors elected to value the corporate stock at $3,446.67 per share, or $68,953 per 20-share block. At the May 6, 2011, meeting, held at Brad Johnson’s shop, the board of directors voted for the gin to remain closed for the 2011 ginning season. Throughout all these votes for the gin to close and remain closed, there was no business plan in place for the gin.
The plaintiffs filed this lawsuit on February 28, 2011. After several amending and supplemental petitions, all directors of the gin were named as defendants in the lawsuit. The defendants filed the exception of prescription and a motion for summary judgment. Included among the submissions in support of the motion were the gin’s articles of incorporation and amendments, affidavits, minutes, Oliver’s projections, and depositions of the parties and Oliver. In opposition to the motion, Fair Farms submitted the affidavits of Fair-child and several former stockholders, a sealed affidavit from Donald Gregory, the *28 gin’s articles and bylaws, the gin’s La. C.C.P. art. 1442 deposition given by Holt, and exhibits to Oliver’s deposition.
The trial court ruled in October 2011 that the claims for negligence had prescribed. On September 19, 2012, the trial court granted summary judgment for the defendants. Fair Farms appeals both judgments.
JjDISCUSSION
The foundation for this lawsuit lies in the Articles of Incorporation, as amended in 1974. Article XI requires that a stockholder be engaged in the production of cotton.[3] Article XIV provides the procedure for the removal of a stockholder no longer engaged in the production of cotton.[4] Fair Farms claims that the directors breached their fiduciary duties by not enforcing Article XI or XIV, which both require stockholders to be cotton producers. Fair Farms argues that in addition to these articles, a resolution had once been passed that required each stockholder to grow at least 200 acres of cotton per season. Fair Farms contends that the defendants’ goal in not enforcing the articles and shuttering the gin was to increase the value of their shares through liquidating the gin, rather than being forced to sell their shares to the gin for a lower value.
| (¡Robert Holt
Robert Holt bought his stock in the gin from another stockholder trying to divest himself of the stock. Despite understanding the role of Articles XI and XIV in the success of a cotton gin, Holt said the gin was not enforcing the articles because doing so would cause the gin to incur more debt and have greater difficulty reopening. At the time of his deposition, he did not know the amount of money required to resume operations at the gin. Holt asked Oliver about valuing the stock of the gin; Oliver replied that she could not do this.
Holt gave the corporate deposition for the gin in accordance with La. C.C.P. art. 1442. He had been secretary of the gin since 1990 or 1991. He did not believe that stockholders were obligated to grow 200 acres of cotton, as contended by Fair- *29 child, because the rule was not in the articles or bylaws. Holt believed growing as little as 1.2 acres of cotton was fulfilling the Article XI obligation to be a cotton producer.
Holt said the decision not to enforce the gin’s articles was a business judgment, and despite the lack of cotton acreage, a cotton producer should be able to vote his stock. He said every stockholder who voted to close the gin voted his own conviction. He believed that if the gin was not operating, there was no obligation to produce cotton. There were gin meetings in 2011 and 2012 to discuss the availability of cotton acreage. He said the gin’s decision to cease operations was not based solely on the price of cotton.[5]

17.Anthony Waller

Waller had owned stock in the gin for four to five years at the time of his deposition. He is vice-president and a director of the gin. Waller believed that an aspect of the duties associated with these two roles was to make the decision on whether to operate, liquidate, or close the gin. He said when making this decision, the board considered cotton production, cotton producers, and the numbers of possible bales of cotton available to gin. He believed the gin needed 10,000 bales to justify opening, but he did not know the amount of cotton required for the gin to be profitable.
Waller knew that a stockholder must be a cotton producer and saw this requirement as a way to ensure that the gin was profitable. He did not know what efforts were made in 2010 to determine the volume of cotton necessary for the gin to operate. Waller acknowledged that cotton prices were one of many considerations in the decision to close the gin each year after 2009.

Cary Boyce Miller

Miller bought newly issued shares of stock, in a sale Fairchild orchestrated, seven or eight years prior to the lawsuit. He purchased the stock for $150,000 credit and made annual payments of $15,000 to the gin. When Miller acquired the stock, he was planting 1,000 to 1,300 acres of cotton annually and ginning at another gin, Hollybrook.
Miller did not know if he was on the board of directors and did not recognize a fiduciary duty of the board. He recalled discussions about the requirement that stockholders grow 200 acres of cotton but none referring to |8Article XIV. He remembered Fairchild mentioning the bylaws and something about returning stock to the corporation if a stockholder did not grow cotton. He did not know about duties in the articles to grow cotton.
Miller said the presentation by Alyssa Oliver was the deciding factor in his vote to close the gin, due to his existing debt from the stock purchase and his belief that he would be responsible for additional debt of the gin. He did not recall discussing rebates during Oliver’s presentation of costs for the upcoming season. Miller said there was a discussion about available acreage for the gin in 2010, but he did not recall a similar discussion in 2011.

William Bradley Johnson

Johnson became a stockholder in Transylvania Gin after inheriting his father’s stock. The stock is now owned by JBF Partnership, represented by Johnson. Johnson was elected gin president in 2009 and believed his responsibilities included running the business. He did not develop *30 a business plan for the gin, because there was never one under Fairchild and he saw no need for one. Johnson said Fairchild did not enforce the provision in the bylaws that required stockholders to turn in then-stock if they did not wish to grow cotton.
Johnson believed Fairchild was president of the gin for so long because there were never any elections, but he acknowledged the lack of interest in the position. He believed that Fairchild resigned from his position as president because he was losing control of the gin.
Johnson said that when deciding whether or not to close the gin, he, [9WalIer, and Holt discussed the available acreage for the 2009 season. He did not know what efforts were made to determine acreage available to the gin in 2010 or if any of the stockholders determined the acreage necessary for the gin to be profitable in 2010, considering the historically high prices at the time being offered for cottonseed oil. The board met on May 6, 2011, to discuss cotton acreage for the 2011 season.
Johnson did not have discussions about demanding the return of stock to the gin because he said no one wanted to buy the stock. He did not want to buy Holt’s stock personally or for the gin because he did not want the gin to assume more debt and did not want to have to grow enough cotton to fuel the gin himself.
Johnson estimated that in order to be profitable, and not simply scraping by, the gin would need to gin 10,000 bales of cotton, or around 5500 to 6000 acres of cotton. He believed that Oliver’s projections for 2009 were part of the reason stockholders voted to close the gin, the other part being fear of large expenses.

Johnny and Linda Johnson

Johnny Johnson and Linda Carol Johnson are joint stockholders of shares inherited from their parents. At the time of his deposition, Johnny was essentially the controlling stockholder because Linda lived in Georgia. He was elected to the gin’s board of directors in the spring of 2011. Johnson remembered Oliver’s presentation and the meeting in which the available bales of cotton were discussed. He decided to vote to close the gin after Oliver’s presentation, which he said caused him to realize the risk of | ^operating.
Johnson had no part in managerial decisions in 2009. In the 2010 meetings he attended, he did not recall discussing the available cotton acreage- or if anyone attempted to determine potential profits with historically high cottonseed prices existing in 2010. He remembered a meeting to discuss available cotton acreage for 2011. He believed it was in the best interest of the gin to remain closed in 2010 and 2011.

Roy Dean Hart

Roy Dean Hart, formerly a plaintiff, now deceased, had been a stockholder in the gin since 1990. Hart testified he was an officer of the gin who recorded minutes from time to time. Hart did not remember if he attended the meeting at which Oliver presented her projections for the 2009 season. Nevertheless, he did not believe that her calculations presented a fair picture of .the income of the gin.
Hart believed that the defendants were attempting to remove Fairchild from the gin and his position as president. He also believed there was a rule of thumb that had been followed during his 19 years at the gin that required each stockholder to plant 200 acres of cotton per season.

Robert Alton Fairchild

Fairchild became a stockholder in Transylvania Gin in 1968 and president of the gin from 1972 until his resignation in March 2009. Fairchild believed that if stockholders had abided by the bylaws, he *31 would have been able to run the gin profitably.
Fairchild said that the price of Boyce Miller’s stock in the gin was |¶1 determined by considering recently paid off debt of the gin and the effect on the value of the gin as a whole. He said, in the past, he was able to run the gin profitably on 2,700 bales of cotton when seed prices were $45 per ton.
Fairchild contended that he had contacted parties, including Donald Gregory, who would have been interested in buying stock in the gin at a reasonable price. Gregory confirmed by affidavit that he and his sons were interested in the stock, if available for a fair price. Fairchild said that he was unable to talk to other stockholders around the time of discussions about closing the gin.
Fairchild believed that stockholders who were not planting cotton should not be allowed to vote their stock. Fairchild said that during his tenure at the gin, several people had decided not to plant cotton and sold their stock back to the gin. Others who had farmed less than 200 acres had their rebate amounts reduced. He never sent a certified letter requesting Holt’s stock because he believed his offer at the meeting in January was sufficient.
SUMMARY JUDGMENT
Our law pertaining to review of motions for summary judgment is well settled.[6]
*32 112Fair Farms alleges that the directors breached their fiduciary duties to the gin. La. R.S. 12:91 defines the fiduciary duty officers and directors owe to the stockholders of a corporation.[7] The duty imposed is one of good faith | j3and reasonableness. Findings as to breach of this duty necessitate analysis of subjective intent.
Defendants cite Subsection (C) of La. R.S. 12:91 and contend they relied in good faith on Oliver’s projections and made a rationally based business judgment to suspend ginning operations.
When granting the defendants’ motion for summary judgment, the trial court concluded there was no evidence that the defendants breached their fiduciary duties or evidence of a lack of good faith amounting to reckless disregard or indifference to the best interests of the gin and its stockholders.
The depositions of the stockholders of the gin are the primary source of evidence in this case. To determine the good faith of the stockholders of the gin, the events preceding the votes to close the gin are critical to the finding of good faith. Unfortunately, there is no clear picture of the actions of the stockholders during the time frame commencing immediately before the decision to close the gin through the date of trial.
Much of the dispute is related to Oliver’s presentation of potential income for the gin in 2009. Holt said Fairchild knew that Oliver was coming to the meeting to discuss the gin’s financial situation; Fairchild 114denied this. Holt organized the meeting because Fairchild would not have trusted any figures that Holt would have presented. Fairchild believed that Oliver’s presentation was not a full reflection of the income of the gin. In her deposition, Oli *33 ver said that rebates were inappropriate to include in her calculations. All parties agreed on-the speculative nature of cottonseed rebates but acknowledged they were a major source of income for the gin’ and had historically been issued to the gin each year. The information Holt gave Oliver to prepare her projections was also affected by Holt’s relatively limited knowledge about gin operations, compared to Fair-child’s, particularly as to the rebates in the form of workout monies.
Holt and Waller believed that in 2009 Fairchild said that Donald Gregory, one of the largest cotton producers in the area and a former customer of the gin, was “off the table” as a potential client for the gin and that is why no one contacted Gregory. Fairchild denied ever saying this and maintained that Gregory had orally committed to returning to the gin with 2,400 acres of cotton. Gregory and his family ginned 1,528 bales at the gin in 2008. They ginned 1,930 bales in 2009; 3,500 bales in 2010; and 3,917 bales in 2011. Holt believed Brad Johnson said he would contact Donald Gregory about ginning in the 2010 and 2011 seasons. Brad Johnson said he believed Fairchild’s friendship with Gregory would dissuade Gregory from coming to the gin, so Johnson did not call him.
Some stockholders attempted to recruit cotton from sources other than Donald Gregory. Waller spoke to some potential customers about ginning cotton at Transylvania in 2011, but they were not planting cotton. | ^Neither Waller nor Johnny Johnson contacted anyone about bringing cotton to the gin in 2009; Miller had not spoken to other farmers about this either. Fairchild said that LaBane Clement would reconsider planting cotton if the gin opened. Brad Johnson said that before the decision to close the gin in 2009, he attempted to recruit cotton from farmers to bring to the gin.
Though Article XI states that a stockholder must be a cotton producer, many of the stockholders, including the plaintiff, were not cotton producers at times. Holt testified in his deposition that he intended to keep his stock in the gin because he was under no financial pressure to get rid of the stock and was holding it at no cost. After Miller lost money growing cotton in the 2009 season, he expressed his desire to sell the stock and pay off his note on the stock. Brad Johnson discussed with Fair-child offering the stock of-the nonproduc-ers to cotton producers and said both Waller and Holt expressed interest in selling their stock.
Fairchild believed that a stockholder who was not producing cotton should have no vote in the gin. His belief was partially based on a handwritten, undated, unsigned sheet of paper that he said Hart gave him, recording a motion, made by A.J. Johnson and seconded by Waller, to amend the articles to require each stockholder to plant 200 acres of cotton, the failure to do so being a violation of Article XIV. He knew this amendment was not officially added to the articles but attributed that to the informal way the gin was run. Fair-child also said the failure to plant 200 acres of cotton limited the rebates the stockholder received in the past.
Fair Farms’ claims are partially based on the failure of some directors | ^and stockholders to grow cotton. Fairchild had not produced cotton since 2008, but prior to that produced 475 acres of cotton annually. Hart leased land to a tenant who, as part of the lease, ginned cotton at Transylvania Gin; around 225 acres were devoted to cotton. Hart acknowledged that this number varied, and Fairchild said at times Hart planted less than 200 acres. Miller farmed 450 acres of cotton in 2009, *34 ginned at Raley Brothers, and did not plant cotton in 2010 or 2011. Holt planted 25 acres of cotton in 2009, 1.5 acres in 2010, and 1.4 acres in 2011. In 2011, Brad Johnson planted 550 acres of cotton. Brad Johnson and his brother decide what crops to plant on Johnny and Linda Johnson’s land, and decided not to plant cotton there in 2011 and possibly 2010. Waller said he agreed to plant 200 acres of cotton at the January 2009 meeting at which Fairchild agreed to the cost-cutting measures. When Fairchild returned in March and said he no longer agreed with the measures, Waller .again said he would not grow cotton. Fairchild said he agreed to the cost-cutting measures only , because he believed if he did, Waller would plant cotton. In 2009, Waller planted cotton but the crop failed, and he had not planted cotton since.
Many of the other stockholders admitted hearing something about a 200-acre rule, but did not think they were required to plant 200 acres of cotton. Miller and Waller admitted that they had not .read the Articles of Incorporation or the bylaws when this lawsuit was filed. Brad Johnson said he became aware of Article XIV only when Fairchild offered to buy the stock of a nonproducer.
Many directors, including Brad Johnson and Robert Holt, believed | ^enforcing the gin’s articles was optional. The gin’s current officers did not agree on a plan for the future of the gin in 2011. Holt said he believed the gin was to begin liquidation of assets but also said he did not know the gin’s business plan; Johnson denied any plan to liquidate the gin. Miller did not know if the gin had a business plan in 2011.
Finally, despite the gin remaining closed for three ginning seasons, the board of directors voted to nearly double the value of stock in the corporation. Fair Farms claims that this was part of the directors’ scheme to close the gin and make money. Holt said that the value of the stock increased from $35,000 to around $68,000 because of bids on the gin’s equipment. Waller said the increase in stock value was attributable to the increase in cotton prices. Accordingly, Holt said that the board of directors “put a finer pencil to it” when determining stock value. Hart did not know what method was used to value the stock of the gin, but he did not believe that the gin’s assets could cover the set price of stock.
While the plaintiffs do not have to prove the elements of their claims on summary judgment, they are required to show that there is factual support for the elements. The factual support for the plaintiffs’ claims, and the defendants’ defenses, is primarily found in the parties’ depositions. The depositions reflect several disputed factual issues and a general lack of agreement on how and why the decisions were made to close the gin from 2009 to 2011.
The lack of agreement on these aspects of the internal affairs of the gin from 2009 to 2011 shows the uncertainty that clouds the assessment of |1sthe events surrounding this lawsuit.
The allegations of negligent and intentional breach of fiduciary duty are directly related to the state of mind of the stockholders and their intentions for the gin from 2009 forward. Credibility determinations based on the parties’ depositions are inappropriate for summary judgment. To determine the intent or good faith of the board of directors from 2009 to 2011 calls for credibility determinations of parties based almost solely on the depositions. Summary judgment for the defendants is, therefore, improper.

Exception of Prescription

The prescriptive period for breach of fiduciary duty is provided by La. R.S. *35 12:96.[8] The plaintiffs’ numerous petitions repeatedly allege intentional, as well as negligent, breaches of fiduciary duty. While claims for negligent breach of fiduciary duty have a one-year prescriptive period, claims for the intentional breach of fiduciary duty have a two-year prescriptive period. La. R.S. 12:96.
The claims for intentional breach of fiduciary duty relating to actions or omissions in 2009 are not prescribed to the extent that they allege that the |13breach was intentional. The two-year prescriptive period for the 2009 claims under La. R.S. 12:96(B) was interrupted by the filing of this lawsuit, and claims have not prescribed.
The plaintiffs alleged that each vote by the board of directors for the gin to remain closed was an independent breach of fiduciary duties, whether negligent or intentional. The trial court found that the 2010 and 2011 votes for the gin to remain closed were too interrelated to the original 2009 decision to close the gin to be, an independent cause of action and, thus, were prescribed unless pled to the level of intentional tortious conduct.
We are constrained to find, considering the clear language of La. R.S. 12:96, that the trial court erred in ruling that negligence claims from 2010 and 2011 are prescribed. The trial judge, when granting the exception of prescription for the 2010 and 2011 claims, said, “They are prescribed unless it can be brought up to the level of intentional tortious conduct, because ... everything really goes back to 2009.” We disagree.
In 2010 and 2011, the board of directors admitted to looking at the prospects for the individual growing seasons when deciding whether or not to operate the gin. Each independent decision for the gin to remain closed presents a claim under La. R.S. 12:96(A). The plaintiffs’ claims for negligent breach of fiduciary duty arising from the defendants’ actions in 2010 and 2011 have not prescribed.
|2qDECREE
For the reasons stated above, we reverse the trial court’s summary judgment. We also reverse the judgment granting the exception of prescription insofar as it dismissed the negligence claims arising from actions taken to shutter the gin in 2010 and 2011. We remand the matter to the trial court for further proceedings. Costs are assessed to defendants.
REVERSED AND REMANDED.

. Roy Dean Hart was a plaintiff. After his death, his succession asked that it be substituted as plaintiff and dismissed as it did not want to pursue the suit. The succession sold his stock to the corporation.

. "Workout monies” allowed the gin to receive some of the anticipated rebate money up front.

. Article XI of the Transylvania Gin Articles of Incorporation as amended in 1974: "Any person owning stock in this corporation must be a cotton producer, engaged in the production of cotton, either as lessor or lessee, and must bring his entire crop for ginning to the gin or gins owned or operated by this corporation. The only exceptions to this rule shall be if the gin or gins owned or operated by this corporation are unable to gin the cotton within a reasonable period of time because of mechanical breakdowns or otherwise, and prudent farming practices dictate that the cotton be ginned elsewhere: of [sic] if lease contracts on land farmed by stockholders as tenants require that the cotton be ginned elsewhere. Also, in addition to the two above express exceptions, the directors of this corporation may, under special and unusual circumstances, grant written permission to a stockholder to gin a portion or all of his cotton elsewhere.”

. Article XIV of the Transylvania Gin Articles of Incorporation as Amended in 1974: "If a stockholder withdraws from the production of cotton, either as lessor or tenant; or refuses to bring his entire cotton crop for ginning, to the gin or gins owned or operated by this corporation, without coming under either of the two exceptions referred to in Article XI above, then in this event, the stockholder shall be obligated to transfer his shares of stock to this corporation, within one month from the date requested to do so by the Board of Directors of this corporation, which request shall be sent by certified mail. The price per share to be paid for the shares of stock conveyed to the corporation shall be the value per share fixed at the last preceding annual meeting of the stockholders of the corporation. In the event the stockholder fails to voluntarily comply with the provisions of this Article, within the time provided, then the corporation shall have the right to bring suit to compel the transfer of the stock, in accordance with the provisions of this title.”

. Holt could not name any concerns or factors extant in 2009 to distinguish it from the 2006, 2007, or 2008 seasons.

. A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Samaha v. Rau, 07-1726 (La.2/26/08), 977 So.2d 880. A summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact, and whether the mov-ant is entitled to judgment as a matter of law. Id.
A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B)(2).
The burden of proof on a motion for summary judgment is set forth in La. C.C.P. art. 966(C)(2):
The burden of proof remains with the mov-ant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
This provision initially places the burden of producing evidence at the hearing on the motion for summary judgment on the mover, who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent’s case. Samaha v. Rau, supra; Wright v. Louisiana Power & Light, 06-1181 (La.3/9/07), 951 So.2d 1058. At that point, the party who bears the burden of persuasion at trial, usually the plaintiff, must come forth with evidence (affidavits or discovery responses) which demonstrates that he or she will be able to meet the burden at trial. Samaha v. Rau, supra; Wright v. Louisiana Power & Light, supra.
Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent’s favor. Willis v. Medders, 00-2507 (La. 12/8/00), 775 So.2d 1049.
Summary judgment is seldom appropriate for determinations based on subjective facts of motive, intent, good faith, knowledge or malice, yet it may be granted on a subjective issue when no issue of material fact exists *32 concerning that issue. Johnson v. Pinnergy, Ltd., 46,188 (La.App.2 Cir.4/13/11), 63 So.3d 302. These subjective facts call for credibility evaluations and the weighing of testimony, and summary judgment is inappropriate for such determinations. Louisiana AG Credit, PCA v. Livestock Producers, Inc., 42,072 (La. App.2d Cir.4/4/07), 954 So.2d 883, writ denied, 2007-1146 (La.9/14/07), 963 So.2d 1001. In addition, the circumstantial evidence usually necessary for proof of motive or intent requires the trier-of-fact to choose from competing inferences, a task not appropriate for a summary judgment ruling. Id.

. La. R.S. 12:91 Relations of Directors and Officers to Corporations and Shareholders.
A.Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinary prudent men would exercise under similar circumstances in like positions: however, a director or officer shall not be held personally liable to the corporation or the shareholders thereof for monetary damages unless the director or officer acted in a grossly negligent manner as defined in Subsection B of this Section, or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tor-tious conduct or intentional breach of his duty of loyalty. Nothing herein contained shall derogate from any indemnification authorized by R.S. 12:83.
B. As used in this Section, "gross negligence” shall be defined as a reckless disregard of or a carelessness amounting to indifference to the best interests of the corporation or the shareholders thereof.
C. A director or officer who makes a business judgment in good faith fulfills the duty of diligence, care, judgment, and skill under Subsection A of this Section if the director or officer:
(1) Does not have a conflict of interest with respect to the subject of the business judgment.
(2) Is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances.
(3) Rationally believes that the business judgment is in the best interests of the corporation and its shareholders.

. A. No action for damages against any director or officer for breach of his duty as a director or officer, including without limita? tion an action for gross negligence, but excluding any action covered by the provisions of Subsection B of this Section, shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered.
B. No action for damages against any director or officer for intentional tortious misconduct, or for an intentional breach of the director’s or officer’s duty of loyalty, or for acts or omissions in bad faith, or involving fraud, or a knowing and intentional violation of law, shall be brought unless filed in a court of competent jurisdiction and proper venue within two years from the date of the alleged act or omission, or within two years from the date the alleged act or omission is discovered or should have been discovered.