954 So.2d 883 (2007)
LOUISIANA AG CREDIT, PCA, Plaintiff-Appellee
v.
LIVESTOCK PRODUCERS, INC., et al., Defendant-Appellant.
No. 42,072-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2007.
Rehearing Denied May 3, 2007.
*885 William H. Hallack, Jr., Dennis W. Hallack, West Monroe, for Appellant.
Michael A. Stroud, Roger J. Naus, for Appellee.
Before WILLIAMS, DREW and MOORE, JJ.
WILLIAMS, J.
Livestock Producers, Inc., Mary Alice Stratton and George Ronald Stratton (collectively referred to as "Livestock Producers") seek reversal of the district court's ruling granting summary judgment in favor of Louisiana AG Credit, PCA ("PCA"). For the reasons that follow, the judgment of the district court is hereby reversed and we remand this matter for further proceedings.

FACTS
Livestock Producers was in the business of operating a cattle-sale barn. PCA is a farm credit association. On or about October 21, 1999, Livestock Producers executed a revolving credit promissory note in favor of PCA in the principal amount of $800,000, plus interest at a variable rate as provided in the note. The promissory note required Livestock Producers to pay the note on demand at PCA's discretion. If no demand was made, Livestock Producers was required to pay all advances made by PCA pursuant to the revolving credit note, plus interest following each cattle auction conducted by Livestock Producers. The revolving credit note further required Livestock Producers to make regular monthly payments of accrued unpaid interest to PCA.
Over the next five years, PCA continued to provide financing to Livestock Producers on substantially the same terms and conditions set forth in the original promissory note. During the course of the lending relationship, Livestock Producers executed other revolving credit promissory notes in favor of PCA. The last note and loan agreement were executed on February 28, 2005.
From the time the initial loan agreement was made, Livestock Producers issued checks made payable to PCA following each cattle auction, and PCA advanced additional funds. On or about March 10, 2005, following an auction, Livestock Producers issued four checks, totaling $446,733.23, payable to PCA, toward the amount owed under the revolving credit agreement. In turn, PCA advanced an additional $447,379.40 in principal to Livestock Producers. Soon thereafter, Livestock Producers placed stop payment orders on the four checks.
On April 29, 2005, PCA instituted an action to recover the monies owed. On September 7, 2005, PCA filed a motion for summary judgment, alleging it was entitled to a judgment against Livestock Producers in the amount of $893,466.46, plus court costs and attorneys' fees. Livestock Producers opposed the motion for summary judgment, submitting a 13-page joint *886 affidavit from George Ronald Stratton ("Ronnie") and Mary Alice Stratton ("Mary").
On October 6, 2005, Livestock Producers filed a "First Amended Answer, Reconventional Demand and Third Party Demand," asserting a reconventional demand against PCA for lender liability. Livestock Producers also asserted a third-party demand against James B. Smith ("Smith"), President and Chief Executive Officer of PCA, and Leotis Hyde, Jr. ("Hyde"), PCA's Senior Vice President and Chief Credit Officer, for intentional interference with contractual relations. An additional third-party demand was asserted against Hyde for intentional infliction of emotional distress.
On October 19, 2005, the district court granted summary judgment against Livestock Producers and awarded $893,466.46, plus legal interest, to PCA pursuant to LSA-R.S. 9:2782.2(A). The district court also rendered judgment against Livestock Producers, Ronnie and Mary in solido, for indebtedness owed to PCA under a revolving credit note in the principal amount of $791,320.21, plus interest and attorneys' fees. The district court did not address any of the incidental demands asserted by Livestock Producers. The judgment was not appealed.
On May 16, 2006, PCA filed a motion for summary judgment with regard to the claims asserted in Livestock Producers' reconventional and third-party demands. In response, Livestock Producers filed a memorandum in opposition which "incorporated by reference" the joint affidavit from Ronnie and Mary previously submitted with the opposition to the motion for summary judgment in the principal action. No new affidavits or other evidence was introduced in opposition to the motion.
In the affidavit, the Strattons attested, inter alia, that the lending relationship between PCA and Livestock Producers began without problems. Mary would call the bank to request funds and a check would be issued to her when she arrived at the bank. However, on August 8, 2002, when she arrived at the bank, Mary was told by bank employees that Hyde had instructed them not to issue a check. Ronnie called Smith, who authorized the funds. The following day, the Strattons attended a social event at which Hyde and his wife were in attendance. At some point during the event, Hyde approached Mary and rubbed his finger down her arm, commenting that he "sure would like to have sex" with her and she "would be surprised how he could make any problems with the Livestock Producers loan disappear." Mary declined Hyde's offer, and he told her that she "really needed to think about it."
The Strattons stated that the lending relationship between Livestock Producers and PCA began to deteriorate after Mary rebuffed Hyde's sexual advance. Hyde changed the paperwork required to obtain the weekly advances against the line of credit, making the process increasingly difficult. Whether the funds would be advanced and in what amount was within Hyde's sole discretion. In 2004, Hyde began to require weekly meetings with regard to the renewal or extension of the line of credit, and Mary's presence was always requested at the meetings. During one of the meetings held in February 2005, Hyde stated that he had a "Plan B" with regard to the lending relationship between PCA and Livestock Producers. While alluding to the alternate plan, Hyde looked directly at Mary and refused to explain what he meant to the meeting's other attendees. Later that month, Hyde went to Livestock Producers' auction barn and approached Mary, telling her that he still *887 thought the two of them could "work this out."
In July 2004, the three-year line of credit was due for renewal. Hyde began to issue renewals or extensions on a month-to-month basis only, causing Livestock Producers to face a monthly note in excess of $800,000. PCA also "tightened the screws" by causing unscheduled audits of Livestock Producers' custodial account by both Packers and Stockyard Administration and the Louisiana Department of Agriculture. The Strattons further attested that Mary began treatment for "stress-related medical problems" as a result of Hyde's conduct.
Following a hearing, the district court granted summary judgment in favor of PCA and dismissed the reconventional and third-party demands with prejudice. The district court refused to consider the joint affidavit submitted, stating:
I really don't think that I can consider the stale affidavit submitted in a completely different motion. I think that it would have had to have been resubmitted and updated as an opposition to the motions that are before the Court this morning. So I think for that reason that the motions for summary judgment are entitled to be granted as a matter of law.
The district court further stated:
[I]f I had considered the prior affidavit of the original defendants in this case that because on the first cause of action, the lender liability, I would find that the Henning [Construction, Inc. v. First Eastern Bank & Trust Co., 92-0435 (La. App. 4th Cir.3/15/94), 635 So.2d 273, writ denied, 94-1544 (La.9/30/94), 642 So.2d 870] case is applicable. On the-with regard to the tortous [sic] interference, I think the 9 to 5 [Fashions v. Spurney, 538 So.2d 228 (La.1989)] factors are so limited that they would not be applicable in this case and I would have granted summary judgment on that ground as well. And on the intentional infliction of emotional distress, I find that that cause is not under these facts a continuing tort and therefore, has  has prescribed.
Livestock Producers filed the instant appeal.

DISCUSSION
Livestock Producers contends the district court erred in refusing to consider the affidavit and in granting summary judgment. According to Livestock Producers, the Code of Civil Procedure makes no distinction between "fresh" and "stale" affidavits.
In determining whether summary judgment is appropriate, appellate courts are to review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is proper. Suire v. Lafayette City-Parish Consolidated Government, XXXX-XXXX (La.04/12/05), 907 So.2d 37. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action and shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(A)(2) and (B).
The burden of proof remains with the movant. LSA-C.C.P. art. 966(C)(2). However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more *888 elements essential to the adverse party's claim, action, or defense. Id. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Id.
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. LSA-C.C.P. art. 967(B).
The Affidavit
In the instant case, in opposition to PCA's motion for summary judgment, Livestock Producers filed an opposing memorandum and "incorporated by reference" the joint affidavit of Ronnie and Mary, which had been filed in opposition to PCA's motion for summary judgment in the principal action.
Documents may be considered in support of a motion for summary judgment if they are attached to a pleading that is in the record. Hunt v. Petroleum Corp. v. Texaco, Inc., XXXX-XXXX (La.App. 4th Cir.12/1/04), 891 So.2d 36; Broadbridge v. Perez, 565 So.2d 1090 (La.App. 4th Cir.1990). Written motions for summary judgment constitute "pleadings" under LSA-C.C.P. art. 852. Written documents may be attached to pleadings and made part thereof. See, LSA-C.C.P. art. 853; Arnette v. NPC Services, Inc., XXXX-XXXX (La.App. 1st Cir.2/15/02), 808 So.2d 798.
In Palmer v. Ameriquest Mtg. Co., 41,576 (La.App. 2d Cir.12/13/06), 945 So.2d 294, the defendants argued that references to a deposition should not be considered by this court because the plaintiff failed to attach a copy of the deposition to his motion for summary judgment. Conducting a de novo review of the record, this court ruled that the deposition would be considered, stating:
Counsel for [plaintiff] attached a complete copy of [defendant's] deposition to the "omnibus motions" filed into the record on June 20, 2005. He did not attach it to this motion for summary judgment, but at the hearing he referred to the deposition and advised the court that it was in the record. This was sufficient to direct the court's attention to a deposition that was already on file within the meaning of art. 966 B. . . . Under the circumstances, the deposition was on file and its existence was clearly pointed out to the court.
Id. at 300-01 (emphasis in original).
We find that the district court erred in refusing to consider the affidavit on the basis that it had been "submitted in a completely different motion." The affidavit was attached to the memorandum in opposition to the initial motion for summary judgment and was a part of the record.
We also reject PCA's contention that the affidavit is inadmissible because one of the affiants, Ronnie, died before the current motion for summary judgment was filed. According to PCA, because the affidavit is a "joint affidavit" submitted by both Ronnie and Mary, it does not comply with the requirements of LSA-C.C.P. art. 967, which provides in pertinent part:
A. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent *889 to testify to the matters stated therein. . . .
It is clear that Ronnie is an unavailable witness, as defined by LSA-C.E. art. 804(A)(4).[1] However, the joint affiant, Mary, "is competent to testify to the matters stated" in the affidavit. In fact, the reconventional and third-party demands are primarily centered around allegations made by Mary. The allegations pertain to alleged conduct by Hyde which Ronnie did not witness. Therefore, the district court should have considered the joint affidavit which was a part of the record and incorporated by reference in support of the opposition to the motion for summary judgment.
Reconventional and Third-Party Demands
The district court further concluded that even if it had considered the affidavit, summary judgment in favor of PCA is still proper. For the following reasons, we reverse that ruling.
Lender Liability
In its reconventional demand, Livestock Producers alleged that PCA was negligent and failed to act in good faith during the lending relationship. Citing Henning Construction, Inc. v. First Eastern Bank & Trust Co., 92-0435 (La.App. 4th Cir.3/15/94), 635 So.2d 273, writ denied, 94-1544 (La.9/30/94), 642 So.2d 870, PCA contends it did not owe a duty of good faith to Livestock Producers.
At the time this action was filed, LSA-R.S. 10:1-203 provided:
Every contract or duty within this Title imposes an obligation of good faith in its performance and enforcement. The standard of good faith performance required under this Title shall be based upon Civil Code Articles 1983, 1996, and 1997.
Contracts must be performed in good faith. LSA-C.C. art. 1983. An obligor in good faith is liable for the damages that were foreseeable at the time the contract was made. LSA-C.C. art. 1996. An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. LSA-C.C. art. 1997.
The decision to request payment of a demand instrument does not fall within the good faith connotations of LSA-R.S. 10:1-203 and 1-208. Bespress, Inc. v. Capital Bank of Delhi, 616 So.2d 795 (La. App. 2d Cir.1993); Commercial National Bank in Shreveport v. Audubon Meadow Partnership, 566 So.2d 1136 (La.App. 2d Cir.1990); Henning Construction, supra.
In the instant case, our examination of the language of the promissory notes reveals that they are unquestionably demand notes.[2] However, Livestock Producers does not allege that PCA acted in *890 bad faith in demanding payment of the notes. Rather, it contends the bank failed to act in good faith in the following manner, inter alia:
1. Hyde structured the lending relationship in such a manner as to require Livestock Producers to face a demand note of over $800,000 each month;
2. Hyde made sexual advances towards Mary in exchange for leniency with the loan;
3. After Mary rebuffed his advances, Hyde caused the lending relationship to become increasingly onerous;
4. PCA caused unscheduled audits with Packers and Stockyard Administration and the Louisiana Department of Agriculture;
5. PCA, knowing Wednesday was Livestock Producers' auction day, caused the petition and discovery requests to be served on Wednesdays and attempted seizure of cattle to take place on a Wednesday in the presence of hundreds of customers;
6. One of PCA's executives told one of Livestock Producers' customers that she should not sell her cattle through Livestock Producers because it was a "bad risk;"
7. PCA sent an employee to all of the banks doing business with Livestock Producers to persuade the other banks to join PCA's lawsuit;
8. Hyde told other members of the banking community that Livestock Producers had submitted inaccurate financial statements which excluded the debt owed to PCA;
9. Smith and other PCA executives shared the details of the lending relationship between Livestock Producers and PCA with others;
10. PCA attempted to persuade other banks to stop doing business with Livestock Producers.
Thus, it is clear from the language of Livestock Producers' reconventional demand that the claims asserted with regard to lender liability do not center around PCA's decision to request payment of the note. Therefore, the cases relied upon by the district court and PCA do not apply.
Black's Law Dictionary defines "good faith" as "an intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage, and an individual's personal good faith is a concept of his own mind and inner spirit. . . ." Black's Law Dictionary defines "bad faith" as follows:
The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term `bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.
Summary judgment is seldom appropriate for determinations based on subjective facts of motive, intent, good faith, knowledge, or malice. Jones v. Estate of Santiago, XXXX-XXXX (La.4/14/04), 870 So.2d 1002; Hooker v. Wal-Mart Stores, Inc., 38,350 (La.App. 2d Cir.4/07/04), 870 So.2d 1131, writ denied, XXXX-XXXX (La.9/24/04), 882 So.2d 1142. *891 One reason is that these subjective facts call for credibility evaluations and the weighing of testimony. Hooker, supra; Oaks v. Dupuy, 32,070 (La.App. 2d Cir.8/18/99), 740 So.2d 263, writ not considered, 99-2729 (La.11/24/99), 750 So.2d 993. Furthermore, the circumstantial evidence usually necessary for proof of motive or intent requires the trier-of-fact to choose from competing inferences, a task not appropriate for a summary judgment ruling. Hooker, supra.
After reviewing the record in this case, we conclude that the affidavit submitted by Livestock Producers raised a genuine issue of material fact with regard to whether the actions of PCA and its employees were prompted by a "dishonest purpose or moral obliquity" and/or "furtive design or ill will." It is clear that the purpose of the initial lawsuit filed by PCA was to recover funds owed by Livestock Producers. However, the motives and/or intent of PCA and Hyde with regard to the restructuring of the lending relationship and the other alleged conduct remain unclear. Consequently, the district court erred in granting PCA's motion for summary judgment.
Interference With a Contract
We also conclude that summary judgment is inappropriate for the disposition of the third-party demand for tortious interference with a contract. In one of the third-party demands, Livestock Producers alleged Smith and Hyde tortiously interfered with its contract with PCA. The district court concluded that summary judgment was appropriate pursuant to the factors set forth in 9 to 5 Fashions v. Spurney, 538 So.2d 228 (La.1989). In that case, the Supreme Court held that an action against a corporate officer for intentional and unjustified interference with contractual relations requires proof of the following:
1. The existence of a contract or a legally protected interest between the plaintiff and the corporation;
2. The corporate officer's knowledge of the contract;
3. The officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome;
4. Absence of justification on the part of the officer;
5. Causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
In this case, it is undisputed that a contract existed between Livestock Producers and PCA, and Smith and Hyde had knowledge of the contract. Whether Smith and Hyde intentionally induced or caused PCA to breach the contract or intentionally rendered the performance of the contract impossible or more burdensome, without justification, are questions of fact to be determined by a trier of fact. As stated above, summary judgment is rarely appropriate when subjective facts are at issue.
Intentional Infliction of Emotional Distress/Prescription
Finally, with regard to the third-party demand against Hyde for intentional infliction of emotional distress for sexual harassment, we reject PCA's contention that the continuing tort doctrine does not apply under the facts of this case. Therefore, we reverse the district trial court's determination that the intentional infliction of emotional distress claim has prescribed.
Delictual actions are subject to a liberative prescriptive period of one year commencing from the day the injury or damage is sustained. LSA-C.C. art. 3492. Prescriptive statutes are to be strictly construed *892 against prescription and in favor of the obligation sought to be extinguished. Bustamento v. Tucker, 607 So.2d 532 (La. 1992); Fuller v. Baggette, 36,952 (La.App. 2d Cir.5/6/03), 847 So.2d 26, writ denied, 2003-2076 (La.11/7/03), 857 So.2d 498. Of two possible constructions of a prescription statute, one barring the action and one maintaining it, the statute will be read in such manner as to maintain the action. Elevating Boats, Inc. v. St. Bernard Parish, XXXX-XXXX (La.9/5/01), 795 So.2d 1153; Lima v. Schmidt, 595 So.2d 624 (La.1992); Fuller, supra.
When tortious conduct and resulting damages are of a continuing nature, prescription does not begin until the conduct causing the damages is abated. Bustamento v. Tucker, 607 So.2d 532 (La. 1992); Stett v. Greve, 35,140 (La.App. 2d Cir.2/27/02), 810 So.2d 1203. The principle of a continuing tort applies only when continuous conduct causes continuing damages. Stett, supra. The continuous nature of the conduct complained of has the dual effect of rendering such conduct tortious and of delaying the commencement of prescription. Bustamento, supra; Stett, supra. The conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature and prescription does not commence until the last act occurs or the conduct is abated. Id.
In Bustamento, supra, the plaintiff filed a tort action for intentional infliction of emotional distress against her employer and certain fellow employees, alleging that one of her co-workers had subjected her to almost daily incidents of sexual harassment over a two-year period. The Supreme Court stated:
While each incident alleged by Ms. Bustamento may not necessarily be classified as "outrageous," when her allegations are viewed properly as a whole, consisting of a continuing flow of related acts, by the same actor, stretching across a two-year span, the cumulative effect of them could serve to render such actions "outrageous" and actionable under White [v. Monsanto Co., 585 So.2d 1205 (La.1991)]. Moreover, the last act, just as previous acts of harassment, does not have to be in and of itself actionable, but rather need only be an act in furtherance of the continuing pattern of harassment so as to indicate that the harassment has not abated.
Id. at 543 (footnote and citations omitted).
In this case, Mary stated in the affidavit that Hyde approached her and suggested engaging in a sexual relationship with her on August 9, 2002. Soon thereafter, he began to make changes to the method by which funds were disbursed to Livestock Producers. The next alleged related incident took place in February 2005, when during a meeting, Hyde allegedly looked at Mary and stated that he had a "Plan B" with regard to the lending relationship. Finally, in February 2005, Hyde allegedly went to Livestock Producers' auction barn, where he stated to Mary that the two of them could "work this out." The third-party demand was filed on October 6, 2005.
It is apparent from the record before us that the relationship between PCA and Livestock Producers concerned the advancement of funds on a frequent basis. It is undisputed that Hyde's duties, as chief credit officer, included management of the loan. Once Mary refused to enter into a sexual relationship with Hyde, as he allegedly first suggested in August 2002, the relationship between PCA and Livestock Producers began to deteriorate, with Hyde making the lending process increasingly difficult.
*893 In our view, the alleged incidents with Hyde and Mary cannot be disunited from Hyde's alleged conduct in causing or contributing to the deterioration of the lending relationship with Livestock Producers. Hyde's actions cannot justly be classified as separate acts of negligence. Therefore, we conclude that if proven, the series of acts by Hyde would have continued to compound Mary's damage. The continuous negligent acts by the same party, Hyde, coupled with the cumulative nature of the damages, make this case a continuing tort, for which prescription did not begin to run until the last act occurred, February 2005. Accordingly, we reverse the district court's conclusion that the claim for intentional infliction of emotional distress has prescribed.

CONCLUSION
For the foregoing reasons, the summary judgment rendered in favor of Louisiana AG Credit, PCA is hereby reversed and the matter is remanded for further proceedings. Costs of this appeal are assessed to the appellee, Louisiana AG Credit, PCA.
REVERSED AND REMANDED.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, DREW, MOORE and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] LSA-C.E. art. 804(A)(4) provides:

A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
* * *
(4) Is unable to be present or to testify at the hearing because of death. . . .
[2] A promise or order is "payable on demand" if it (i) states that it is payable on demand or at sight, or otherwise indicates that it is payable at the will of the holder, or (ii) does not state any time of payment. LSA-R.S. 10:3-108(a). A provision for monthly installments does not destroy the demand nature of a note. Henning Construction, supra; Johnston v. Johnston, 568 So.2d 567, 568 (La.App. 5th Cir.1990), writ denied, 571 So.2d 655 (La. 1990); Blanchard v. Progressive Bank & Trust Co., 413 So.2d 589, 591 (La.App. 1st Cir. 1982).