STEWART, J.
bln this action by the plaintiff, Monroe Surgical Hospital, L.L.C. (hereafter “MSH”), alleging breach of fiduciary duty, unfair trade practices, and antitrust violations, the defendants, St. Francis Medical Center, Inc., et al (hereafter “SFMC”) are seeking review of the trial court’s denial of an exception of no right of action and a motion for summary judgment. Having conducted a de novo review of this matter, *1237 we affirm the trial court’s judgment and remand for further proceedings.
FACTS

Overview

MSH is a physician-owned specialty hospital with 10 certified hospital beds for overnight patient care. SFMC is a full-service tertiary care hospital. Both are located in Monroe and are competitors. The relevant market, as agreed upon by the parties, is a 50-mile radius surrounding SFMC’s downtown Monroe location. Prior to the events leading to this litigation, there were three full service hospitals in the relevant area — SFMC, North Monroe Medical Center (“NMMC”), and Glen-wood Medical Center (“Glenwood”). MSH was seeking opportunities to allow it to grow and compete more directly with these other full-service healthcare entities.
In August 2004, SFMC purchased 138 units in MSH, gaining a minority interest.[1] The parties’s relationship, which lasted approximately 11 months, was governed by MSH’s Third Amended and Restated Operating Agreement (“the Operating Agreement”), discussed infra. In negotiating its investment in MSH, SFMC obtained the right to appoint two managers to |2MSH’s Board of Managers (“the board”). These individuals were SFMC’s chief operating officer, K. Scott Wester (“Wester”) and its controller, Lisa Bradley (“Bradley”). The dispute between the parties primarily arises from the purchase by SFMC of North Monroe Medical Center (“NMMC”) in 2005, at a time when MSH was attempting to put together a deal with Hospital Partners of America, Inc. (“HPA”) to purchase NMMC. HPA partners with physicians in the ownership of acute care hospitals.
In short, Wester and Bradley, due to their positions on MSH’s board were aware of its plans to acquire NMMC, and MSH claims that they used confidential information gained while serving on the board to benefit SFMC in its efforts to acquire NMMC and acted to thwart MSH’s plans. In doing so, SFMC is alleged to have breached fiduciary duties owed by Wester and Bradley as managers [2], to have violated the Louisiana antitrust law, La. R.S. 51:122, by engaging in activity designed to unreasonably restrain trade, and to have violated the Louisiana Unfair Trade Practices Act (“LUTPA”), La. R.S. 51:1401 et seq. The latter two theories are premised on SFMC’s alleged scheme to remove NMMC as a competitor and to otherwise stifle competition by preventing MSH from entering the full-service hospital market.

Relevant Provisions of the Operating Agreement

As a condition of SFMC becoming a member of MSH, amendments were required which resulted in the Operating Agreement mentioned above. First, we note that § 6.01(a) of the Operating Agreement, provided that the |abusiness, affairs, and authority of MSH would be held by managers, with no member having authority to act on behalf of MSH or to bind it. Pursuant to § 6.02, SFMC was entitled to select one Class C manager and one Class B manager. On the board, SFMC’s managers would have a combined voting power of 24 percent, a minority interest.
Certain operational covenants were added to the Operating Agreement due to the involvement of SFMC. These were set forth in § 2.07 as follows:
*1238 2.07 Operational Covenants. So long as St. Francis ... is a Member of the Company:
(a) MSH will furnish care to the un-derserved ...;
(b) MSH will require an open Medical Staff;
(c) MSH and its personnel shall comply with all applicable laws and regulations of federal, state and local government authorities:
(d) MSH understands and agrees to abide by the Ethical and Religious Directives for Catholic Health Services-Fourth Edition, as published by the U.S. Conference of Catholic Bishops, and any changes as hereafter adopted by the Conference of Catholic Bishops; and
(e) MSH shall not sell any Membership Interest to another hospital or hospital ownership entity without the prior written consent of [SFMC]. Notwithstanding the foregoing sentence, if a determination is made in the annual audit of MSH to the effect that MSH may not be viable as a going concern, then MSH may sell Membership Interests to another hospital or hospital entity, provided that [SFMC] shall have the first option to purchase such Membership Interest on the same terms proposed by a potential purchaser within 15 days of such proposal received by MSH in writing.
SFMC was also exempted from a non-compete provision in the Operating Agreement. Under § 6.12(a) of the Operating Agreement, members were prohibited from having a financial interest in competing|4entities in Ouachita Parish while they remained members and for one year following termination of membership. However, § 6.12(b) exempted SFMC from the above requirement.
Finally, § 13.05(a) provided for the amendment or restatement of the Operating Agreement or its articles by written amendment adopted by the managers. Relevant to SFMC, Subsection (b) provided:
(b) Notwithstanding Section 13.05(a) hereof, for so long as [SFMC] is a Member of the Company, [SFMC’s] consent shall be required to amend the Operating Agreement or Articles of Organization; provided, however, that the failure to grant such consent may be overridden and the amendment adopted by a Major Decision of the Managers. If the amendment is passed over the objection of [SFMC], then [SFMC] shall have a “put option” to require MSH to repurchase [SFMC’s] Membership Interest at Fair Market Value (as determined under the provisions of Section 10.04 of this Operating Agreement as of the date [SFMC] notifies the Company of its desire to exercise the “Put Option”). [SFMC] shall have 10 days from the effective date of the amendment to exercise such “put option,” and MSH shall be required within 90 days of [SFMC’s] exercise of the option either to (I) repeal the amendment; or (ii) purchase the Membership Interests of [SFMC].
“Major Decisions” are delineated in § 6.04 and include such things as entering “into a joint venture, merger or consolidation with or into another entity.”

Time Line of Relevant Events

As stated, the record indicates that sometime in August 2004, SFMC became a member of MSH with the right to appoint two individuals to the board. Bradley was the main representative for SFMC who attended MSH’s board meetings as SFMC’s appointed manager.[3]
*1239 | ¡¿Bradley was present at the board meeting on October 20, 2004. Also present was Tim Schier (“Schier”) of Cain Brothers, an investment firm assisting MSH in securing other investors. Schier reviewed for the board an offer from HPA for a 51/49 joint venture. All, including Bradley, voted in favor of proceeding with negotiations. A “Strategic Partnering Update” paper dated October 20, 2004, indicates that MSH had received proposals from other entities besides HPA, that HPA was one of the entities it selected to make a presentation to MSH and MSH Realty, and that MSH planned a site visit to HPA’s Twelve Oaks Medical Center located in Houston, Texas.
On November 10, 2004, SFMC’s legal counsel, Bruce Mintz, wrote to MSH’s counsel, Wesley Shafto, regarding SFMC’s concerns about the proposed deal between MSH and HPA and MSH’s engagement of Cain Brothers to locate potential investors or purchasers of a majority interest in MSH. SFMC complained that none of these plans were disclosed to it prior to its purchase of a minority stake in MSH. Mintz’s letter noted that MSH’s plans could be detrimental to SFMC’s interests and reminded him of the provision in § 2.07 of the Operating Agreement requiring SFMC’s consent to sell any membership interest to a “hospital ownership entity,” such as HPA. Despite SFMC’s objections, MSH and HPA signed a Letter of Intent on November 15, 2004, for HPA’s purchase of a 51 percent membership interest in MSH. In a letter to HPA, R. Alan Daugherty (“Daugherty”), MSH’s Chief Executive Office, noted that SFMC may have a right of first refusal but had not indicated whether it intended to exercise that option.
| fjMSH’s board next met on November 29, 2004, with Bradley present. The HPA deal was discussed, along with a potential offer from SFMC. A motion was made and passed to amend the Operating Agreement to repeal § 2.07. Bradley voted against the motion. It is clear that MSH planned to proceed with HPA over SFMC’s objections. Following the meeting, Shafto sent an email to Wester on November 30, 2004, in which he noted that Bradley had likely told him of the events at the board meeting. Shafto also mentioned MSH’s “dire financial situation” and the MSH physicians’ concerns about a rumor that SFMC was attempting to derail the HPA deal so that it could buy MSH on a “fire sale” basis.
At the board meeting on December 7, 2004, Schier announced that HPA had decided to back out of the proposed deal, citing as its reason a Congressional moratorium on physician-owned hospitals. Wester, who was present at the meeting as a guest, noted that SFMC was working on an offer but had been waiting to see what would happen with HPA.
In a December 9, 2004, letter to MSH investors, Daugherty informed them of the pullout by HPA. He discussed MSH’s financial condition, which appears to have been precarious, and proposed a plan for additional investments by the physicians to pay down an operating loan and to have some proceeds for working capital until another investor could be found. He noted three possible investors, two of whom where SFMC and NMMC, which was owned by Hospital Corporation of American (“HCA”). MSH’s situation was sufficiently dire that a bankruptcy resolution had been proposed at a meeting on January 26, 2005. However, that resolution was 17rescinded at the MSH board meeting on February 16, 2005, due to MSH’s improving financial condition at the beginning of the year. It was noted at the March 16, 2005, board meeting that February had been the best month in MSH’s history. Also at that meeting, Wester *1240 joined the board as SFMC’s second manager.
On March 28, 2005, HCA issued a press release announcing its decision to divest itself of 10 hospitals located in rural and small urban markets. NMMC was one of the 10 hospitals. HCA retained Merrill Lynch as its advisor for the divestiture. Both MSH and SFMC were interested in acquiring NMMC. MSH’s interest was apparent in a email exchange on April 8, 2005, between Daugherty and Schier whereby Daugherty requested information on possible structures for purchasing NMMC. Schier replied that it was “extremely unlikely that HCA would bite” if MSH attempted a purchase without a strategic partner.
SFMC’s board met on April 20, 2005, at which time Wester gave a strategic update on NMMC and HCA’s announcement. Wester recommended that SFMC offer to purchase NMMC, and he noted that SFMC had already received “the offering memorandum and due diligence packet” from Merrill Lynch, which indicated that HCA would prefer a single buyer for all 10 hospitals but that it would not discount offers for individual facilities. Wester also noted that SFMC had retained its own broker, Shattuck Hammond Partners (“Shattuck Hammond”) and that it had signed a confidentiality agreement. SFMC also retained an attorney with Breazeale, Sachse & Wilson, L.L.P., as counsel in the matter. SFMC’s |sboard approved a resolution to submit a nonbinding Letter of Intent regarding its interest in acquiring NMMC. The resolution further provided that Wester and John J. Finan (“Finan”), Chief Executive Officer of Franciscan Missionaries of Our Lady Health Systems, Inc., SFMC’s parent company, were to determine the amount of the offer. Thus, Wester was essentially spearheading SFMC’s efforts to acquire NMMC.[4] SFMC submitted its Letter of Intent to HCA on April 22, 2005. The letter proposed executing a “Definitive Agreement” by July 29, 2005, and closing on the transaction by August 31, 2005. The Letter of Intent also included a confidentiality agreement between SFMC and HCA.
Shortly after SFMC submitted its Letter of Intent to purchase NMMC, MSH’s board met on April 27, 2005, with Bradley and Wester present. It was noted at the meeting that a nonbinding bid had been submitted for the purchase of NMMC, that the due diligence phase would begin if the bid was accepted, and that the final bid would be binding. At this time, it appears that MSH was unaware of SFMC’s interest in or bid on NMMC, while Bradley and Wester through their position on MSH’s board knew of its interest in and efforts to acquire NMMC. The parties indicated in the record that HCA did not accept either SFMC’s nor MSH’s bids for the purchase of NMMC. However, the bidding process continued.
In a May 17, 2005, email exchange between Schier and Daugherty, Daugherty wrote that he had meet with Terry Linn (of HPA) about its possible acquisition of NMMC. Daugherty noted that he was unwilling to Issever ties with SFMC on the “hope” that HPA would get NMMC but that he was “ready to sell 51% of [MSH] for the right price and then line out our relationship [presumably with SFMC], if he gets [NMMC].” The minutes of MSH’s May 18, 2005, board meeting indicate that final bids were due on June 17, 2005.
On May 19, 2005, Daugherty received an email from a Linda Echols of MSH forwarding an article about a new player, Capella Healthcare (“Capella”), interested in HCA’s hospitals.
*1241 In the meantime, SFMC was continuing efforts to acquire NMMC as evidenced between an email exchange between Wes-ter and Michael Hammond (“Hammond”) of Shattuck Hammond that took place from May 24, 2005 to June 7, 2005.[5] An email from Bradley to Wester on June 8, 2005, indicated that she had an MSH finance committee meeting that night. Wester replied on June 10, 2005, asking whether “[a]nything come out at the meeting?”
MSH’s board next met on June 15, 2005, with Wester and Bradley present. It was noted that the “financial status of NMMC has continued to decline as well as the interest of outside partners.” Of course, it does not appear that MSH was aware at this time of SFMC’s interest in NMMC. In fact, the record indicates that SFMC had made an offer to HCA for NMMC on or about June 20, 2005. However, the minutes of a meeting of SFMC’s board of directors on June 29, 2005, referring to “Project Longitude,” indicate that its offer had been rejected and that SFMC would not make the |innext round of bidding due to HCA’s preference to sell its facilities to one or two buyers. According to the minutes, Wester stated that “SFMC is open to any opportunity that would allow SFMC acquisition of NMMC.”
On July 6, 2005, MSH and HPA entered a binding Letter of Intent with the ultimate goal of purchasing NMMC and merging MSH with NMMC into a new operating entity. The first paragraph of the Letter of Intent summarizes the deal, stating in relevant part that HPA would purchase a 100 percent ownership interest in MSH, and then there was to be a “merger of MSH and a new Louisiana limited liability company formed by HPA (the “New Operating Entity”) to purchase [NMMC]. The Letter of Intent stated that it is “based upon our mutual agreement that the merger of MSH and [NMMC] would be beneficial to patients, physicians and payers in the greater Monroe, Louisiana area.”
MSH’s board held a special meeting on July 6, 2005. Though it was called on short notice, Wester and Bradley were present. The purpose was to discuss the plans outlined in the Letter of Intent with HPA and to get the board’s approval so that HPA could proceed with efforts to acquire NMMC. Daugherty made a presentation of the pros and cons of the plan and explained “that re-syndication would be part of the process allowing new physicians to invest in the new company.” There was discussion that some due diligence with respect to HPA had been done, including review of financials and a visit to an HPA-managed facility in Houston. A motion was made to accept the Letter of Intent as it was in the best interest of MSH. Wester requested time for further review and stated that he would like to Indiscuss the issue with legal counsel. However, the motion passed. Another motion passed to remove all restrictions in the Operating Agreement, namely, §§ 2.07(e) and 6.04(b) pertaining to SFMC, that would prohibit the transaction between MSH and HPA. The board also approved a motion to override any objections by SFMC to amendments to the Operating Agreement so that Daugherty and / or Claude Minor could accept HPA’s Letter of Intent and proceed with arrangements to accomplish the transaction. Lastly, relative to SFMC, the board approved a motion to direct SFMC to inform it as to whether it would exercise its “put option,” accept HPA’s buyout of its membership interests, or remain a member and participate in the transaction under the *1242 same terms as the other members. Wes-ter and Bradley were the sole no votes to each of the above motions.
Following the special meeting of MSH’s board, Wester emailed others at SFMC on July 7, 2005, updating them on what had occurred and discussing the need to protect SFMC’s position in light of the amendments to the Operating Agreement made at the meeting. Wester also wrote, “In reviewing the HPA “deal”, it could be a good move to match their proposal. Looking at just the [MSH] transaction the deal would not be bad for [SFMC].” He suggested that if SFMC got MSH, “it would force out HPA” and perhaps put SFMC in position to acquire NMMC. He then noted that MSH was having an investor meeting that evening.
On July 7, 2005, Bradley attended the MSH investors meeting, which involved the same presentation as at the board meeting regarding the HPA transaction. This was related by Wester to others in the SFMC chain of|12command in an email on July 7, 2005, at 7:19 p.m. Wester related that the “only new information was that [MSH] did inform Capella that they are not interested in any type of transaction.” The record indicates that Capella had made an overture to MSH regarding a possible purchase of NMMC if it succeeded in its bid to HCA. MSH turned down the overture due to an exclusivity provision in the HPA Letter of Intent.
In an email dated July 8, 2005, Wester discussed the efforts still being made by SFMC to acquire NMMC. This involved Hammond contacting someone with “GTCR,” a private equity firm working with Capella, about joining in their deal. Wester noted, ‘We will have to move quickly if indeed we can be part of their package.” On July 12, 2005, SFMC, through Wester, presented a written cash offer to Capella Healthcare to purchase NMMC.
On July 15, 2005, Wester received an email from Shattuck Hammond forwarding an announcement that HCA had sold five of its hospitals and that HCA was still seeking to divest itself of the other five, which included NMMC. That same day, Breazeale, Sachse & Wilson, whom SFMC had retained as its legal advisor in acquiring NMMC, wrote to MSH regarding the July 6, 2005, special meeting of the board. The letter voiced SFMC’s objections to the actions taken at the special meeting, and demanded rescission of all such actions. The letter closed with the following two paragraphs:
As a Member and Manager of MSH, [SFMC] is particularly concerned with the term in the July 5, 2005 letter of intent which states that [SFMC’s] consent to the proposed transaction is not required. This misstatement may expose MSH to claims by HPA, and is strenuously objected to by [SFMC]. We believe that it is in the best interests of MSH that you inform HPA of this issue.
| ^Additionally, since [SFMC] has had no opportunity to review any information pertaining to the proposed transaction, to the extent thát MSH endeavors to go forward with any actions to effectuate a transaction with HPA, [SFMC] intends to exercise its preferences and rights under MSH’s [Operating Agreement] and in accordance with the law.
On July 20, 2005, Capella responded favorably to SFMC’s offer, providing it with confidential “Evaluation Material” on NMMC. Wester signed the letter on behalf of SFMC agreeing to Capella’s terms. At an SFMC board meeting the next day, July 21, 2005, Wester gave an update on “Project Longitude.” He noted that HCA was considering bids from Capella and HPA, the entity interested in purchasing MSH. He noted that on “July 20, 2005, Capella approached SFMC about purchas *1243 ing NMMC” and that SFMC had signed a confidentiality agreement with Capella and retained counsel to assist with the transaction. The minutes do not reflect that Wes-ter mentioned SFMC’s initial overtures to Capella in early July.
In the meantime, counsel for MSH replied on July 21, 2005, to the July 15, 2005, letter from SFMC’s counsel objecting to the actions taken at the special meeting of MSH’s board relative to the proposed deal with HPA. MSH denied any violations of the Operating Agreement. MSH asked SFMC to notify it as to whether it desired to exercise the “put option” or participate in the proposed transaction with HPA. The letter noted that HPA had been made aware of SFMC’s position and that it was still comfortable with moving forward with the deal to acquire NMMC. The letter acknowledged that SFMC and MSH are “business competitors” and that while the parties had hoped for a “mutually beneficial and profitable” relationship, it had been “understood from the beginning that situations may |14arise where [their] interests would diverge.” The letter further informed SFMC that MSH had recently learned of its bid for NMMC.[6] The letter stated, “MSH considers SFMC’s attempt to block the HPA/MSH venture ... as suspect and worthy of closer scrutiny....” Finally, the letter urged SFMC “to withdraw its objections to the proposed transaction which is fair to all members of MSH.”
Bradley, with Wester’s proxy, attended MSH’s board meeting on July 26, 2005. In response to SFMC’s July 15, 2006, letter, the board again offered and approved the same motions that had been passed at the special meeting and again the only nays were Bradley and Wester. The minutes state that Bradley expressed the opinion that not enough information had been provided at the July 6, 2005, meeting to allow SFMC to vote in favor of the motions. Daugherty stated that she got the same information as all other investors and that there was no other information available. Bradley also raised an issue concerning the amount SFMC had invested in comparison to what they would be paid. Daugherty explained it was a “straight equity transfer” and that “[a] large factor is that the purchase price of [NMMC] had not yet been finalized.” The minutes close with the following statement, “Dr. Marx discussed with Mrs. Bradley her fiduciary responsibility to MSH as a Board member, versus her position with St. Francis.” The next day, July 27, 2005, SFMC issued a press release announcing that it had acquired NMMC from Capella.
| ]5With NMMC out of the picture, HPA presented a new Letter of Intent to MSH on July 28, 2005, for the purpose of expanding its facility.
On August 1, 2005, Wester sent a letter to MSH regarding its plan to act at a meeting that night on the Letter of Intent sent by HPA on July 28, 2005. Wester listed a litany of reasons why SFMC believed it “premature” to act, such as the need for more financial information and additional due diligence. Wester also noted SFMC’s willingness to acquire either 51 percent or 100 percent of MSH “at fair market value and on other such terms and conditions as are acceptable” to SFMC.
Wester and Bradley attended MSH’s special board meeting on August 1, 2005. The minutes state that Wester offered an apology on behalf of himself, Bradley, and SFMC, “stating they had hoped for a strategic partner, thought things were going well, but feel their Class C rights should be preserved despite the amendments *1244 made to the Operating Agreement.” He also stated that they had not had enough information to make an informed decision on the HPA deal. Wester claimed that SFMC was not trying to “stifle the transaction” through its request for more information. The discussion then moved on to consideration of the July 28, 2005 Letter of Intent from HPA, by which MSH would be expanded by 50 additional beds and equipped to provide services such as an emergency room and an ICU. Motions were made and approved to accept the Letter of Intent, to amend § 6.04(b) of the Operating Agreement and to override any objection by SFMC to such amendments. Bradley and Wester were the only nay votes to these actions. At the end of the meeting, Wester informed the board that he 11fiand Bradley would no longer be serving on it and that SFMC would appoint replacements.
On August 3, 2005, HPA and MSH issued a press release regarding HPA’s agreement to buy and expand MSH. However, by the end of the year, HPA pulled out of the deal. Citing a “Material Adverse Change” in MSH’s financial condition and prospects, HPA terminated its agreement with MSH by letter dated December 29, 2005.[7]

Procedural History

MSH filed the instant petition for damages on April 19, 2006, naming as defendants St. Francis Medical Center, Inc., St. Francis North Hospital, Inc. (formerly NMMC), Redfield E. Bryan, M.D., Wester, and Bradley, referred to collectively herein as SFMC. MSH asserted claims of breach of fiduciary duty, unfair trade practices, intentional interference with contractual relations, and antitrust violations. Based on the facts related above, MSH alleged a conspiracy to increase SFMC’s market power in the relevant geographic market, to stifle competition, and to create a barrier to entry into the full-service hospital market by MSH. MSH alleged that SFMC’s actions caused adverse economic effects in the market by diminishing competition, thereby giving SFMC a stronger position from which to negotiate payments from insurance companies and uninsured patients. MSH also alleged that SFMC’s actions reduced choice for physicians and patients as to where to practice and obtain medical services. For each count, MSH claimed losses of revenue and profits, business | ^opportunity, equity value, and market share. It also claimed damage to its business reputation.
By judgment rendered January 20, 2009, the trial court granted a partial exception of no cause of action dismissing the claim for tortious interference with contract and dismissing “claims of concerted action and conspiracy between St. Francis Medical Center, Inc., and St. Francis North Hospital, Inc., or as later merged.... ” The trial court took under advisement the partial exception of no cause of action seeking dismissal of the antitrust claims alleging a conspiracy or concerted action between the hospital and Bradley, Wester, and Bryan. However, the trial court later denied this exception by a judgment signed on July 14, 2009. In its reasons for judgment, the trial court found that La. R.S. 51:122, as amended in 2003 in response to the United States Supreme Court case Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), does not mention conspiracies between officers, directors, or employees and the legal entity for which they work. Thus, the trial court found the allegations that Wester, Bradley, and Bryan acted in concert with SFMC adverse to the interests of MSH to assert SFMC’s dominance in the market and to thwart competition to state a cause of action.
*1245 On August 14, 2012, former members of MSH, David Dugas, Don Marx, Claude B. Minor, Jr., Benjamin Stage, and Randolph H. Taylor filed a petition of intervention. The intervenors had been involved in other litigation against MSH, and they intervened to protect their interests in any recovery obtained by MSH. On December 19, 2012, the trial court 118dismissed their petition, granting exceptions of no right of action and no cause of action filed by MSH.
On April 7, 2014, SFMC filed a motion for summary judgment, or an alternative partial motion for summary judgment, seeking dismissal of any or all of the remaining claims or counts asserted by MSH. Alleging that MSH has no right of action to pursue damages based on the July 5, 2005, Letter of Intent, SFMC filed an exception of no right of action on April 19, 2014. SFMC argued that any action for damages accrued to the members of MSH at the time the July 5, 2005, Letter of Intent was executed.
In a judgment rendered July 10, 2014, the trial court denied both the exception and the motion for summary judgment. In its reasons for judgment, the trial court concluded that MSH, a juridical person, is the proper person to sue in this case for the alleged damages. With regard to the motion for summary judgment, the trial court rejected SFMC’s attempt to piecemeal the litigation according to the three Letters of Intent executed between MSH and HPA. Instead, the trial court found that the Letters of Intent are “simply pieces of evidence used to support MSH’s claims.” Addressing the antitrust claim, the trial court wrote that MSH alleged that SFMC violated the law
“by engaging in activity to unreasonably restrain trade with its efforts to shut down one of only two primary tertiary care hospitals against which it competed in the relevant geographic market. They also alleged that [SFMC] violated [LUTPA] by engaging in a scheme to remove [NMMC] as a competitor and deprive MSH of the opportunity to purchase [NMMC] and to compete against [SFMC].
119MSH has provided testimony, argument and other evidence to support the claims asserted. The parties’ experts, while agreeing on some issues differ on many others. The depositions present differing testimony from many of the involved parties.”
Accordingly, the trial court found there to be genuine issues of material fact to be decided by the trier of fact.
Following the trial court’s judgment, SFMC filed an appeal under La. R.S. 51:134 and La. R.S. 51:135.[8] The parties *1246 filed a joint motion to extend the statutory deadlines for deciding this matter. Because the statutory deadlines are mandatory, this court denied the motion, and this matter is being reviewed and decided under the mandatory 20-day period set forth in La. R.S. 51:135. SFMC also filed an alternative request for supervisory review of the rulings at issue. On its own motion, this court has consolidated the writ and appeal for docketing thereby rendering moot SFMC’s motion for leave to use another record in the writ application.[9]
I «DISCUSSION

Exception of No Right of Action

An action can' only be brought by a person who has a real and actual interest which he asserts. La. C.C.P. art. 681; Industrial Companies, Inc. v. Durbin, 2002-0665 (La.1/28/03), 837 So.2d 1207. An exception of no right of action determines whether the plaintiff belongs to the class of persons to whom the law grants the cause of action that is the subject matter of the litigation. La. C.C.P. art. 927; Badeaux v. Southwest Computer Bureau, Inc., 2005-0612 (La.3/17/06), 929 So.2d 1211. The exception is directed to showing that the plaintiff has no legal right or interest in enforcing the matter asserted, based upon the facts and evidence submitted. La. C.C.P. art. 927; Richland Parish Police Jury v. Debnam, 42,421 (La.App.2d Cir.10/17/07), 968 So.2d 294, writ denied, 2008-0016 (La.3/24/08), 977 So.2d 953. Whether a plaintiff has a right of action is a question of law. Id. Therefore, rulings on exceptions of no right of action are reviewed de novo. Id. However, evidence is admissible to determine whether a plaintiff has a right of action, and the burden is on the exceptor to establish that the plaintiff does not belong to the particular class to which the law grants a remedy for the cause of action alleged. Id. ■
SFMC argues that MSH has no right of action because its claims are based on the July 5, 2005, Letter of Intent and that under that agreement MSH had no “go-forward rights.” SFMC argues that the claim asserted by MSH actually belongs to its owners / members at the time of the July 5, 2005, Letter of Intent because the owners were to receive funds from HPA |9Jand that HPA would have then owned MSH. SFMC asserts that MSH had no “go-forward interest” in the new HPA-created entity as provided in the Letter of Intent because it was MSH’s owners who were to have contributed money to the new operating entity that would have attempted to acquire NMMC. We are not persuaded by SFMC’s argument on this exception.
Our reading of the of the July 5, 2005, Letter of Intent[10] is that the parties, MSH and HPA, agreed to a deal involving a merger. As we noted in the above review of the- facts, the deal was summarized in the first paragraph of the Letter of Intent, which explained that HPA would purchase 100 percent ownership interest in MSH and then merge MSH and a new Louisiana limited liability company formed by HPA to purchase NMMC. The surviving entity or new entity after a merger possesses “all the rights, privileges, immunities, powers, and franchises of each constituent entity ... [.]” La. R.S. 12:1361(A)(3). Thus, MSH, and not just its members, would have benefited from the agreement set forth in the Letter of Intent by merging *1247 with a new entity and acquiring NMMC. MSH had “go-forward” rights or interests through the proposed merger. Also, as pointed out by the trial court in its reasons for judgment:
“A limited liability company is a juridical person separate and distinct from its members. Regardless of the membership at the time the cause of action arose, the membership at the time the suit was filed, or the present membership, MSH has the capacity to sue and be sued and is the proper ‘person’ to do so in this case.”
For these reasons, we find that the denial of SFMC’s exception of no right of action was proper.

1¾⅞Motion for Summary Judgment

A de novo review is conducted on appeal of a judgment granting (or denying) a motion for summary judgment. Costello v. Hardy, 2003-1146 (La.1/21/04), 864 So.2d 129; Abraham v. Richland Parish Hosp. Service Dist. 1-B, 39,841 (La.App.2d.Cir.2/8/05), 894 So.2d 1229, writ denied, 2005-0450 (La.4/22/05), 899 So.2d 571. A summary judgment must be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B).[11]
The mover has the burden of proof on summary judgment. But if the mover will not bear the burden of proof at trial on the matter that is before the court on summary judgment, then the mover need only point out an absence of factual support for one or more essential elements of the adverse party’s claim. Then, the burden shifts to the adverse party to produce factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden at trial. Otherwise, there is no genuine issue of material fact, and the mover is entitled to summary judgment as a matter of law. La. C.C.P. art. 966(C)(2).
A summary judgment is rarely appropriate in cases requiring a judicial determination of subjective facts, such as intent, motive, malice, | aagood faith or knowledge. Louisiana AG Credit, PCA v. Livestock Producers, Inc., 42,072 (La.App.2d Cir.4/4/07), 954 So.2d 883, writ denied, 2007-1146 (La.9/14/07), 963 So.2d 1001. This is because such subjective factors require the trier of fact to make credibility evaluations, weigh the testimony, and choose from competing inferences from circumstantial evidence typically used as proof of motive or intent. Id. Additionally, issues that require a determination of reasonableness of acts and conduct of the parties under all the facts and circumstances of a case are not ordinarily disposed of by a summary judgment. Greater Lafourche Port Com’n v. James Constr. Group, L.L.C., 2011-1548 (La.App.1st Cir.9/21/12), 104 So.3d 84.
SFMC first argues that MSH did not meet its burden of proof in the trial court because it did not file a list of disputed facts along with its motion opposing summary judgment as required by District Court Rule 9.10(c). In Miller v. Miller, 35,934 (La.App.2d Cir.5/8/02), 817 So.2d 1166, writ denied, 2002-1890 (La.10/25/02), 827 So.2d 1154, this court noted that the purpose of local rules of court is “to aid in *1248 the orderly and efficient conduct of litigation” and that they “are not to be construed so literally as to defeat their intended purpose.” Id., p. 8, 817 So.2d at 1172; L & A Contracting Co., Inc. v. Mabry, 27,791 (La.App.2d Cir.1/24/96), 666 So.2d 1295. It is within the trial court’s great discretion to construe, interpret, apply, or enforce its own rules. Miller, supra. The trial court was apparently satisfied that MSH’s memorandum in opposition to SFMC’s motion, along with the accompanying exhibits, established a genuine issue for trial and either didj^not find a violation of the rule cited by SFMC or did not find it necessary to enforce the rule. This court finds no abuse of discretion by the trial court in not strictly enforcing the procedural rule at issue. It is clear from our review of the record that MSH appropriately responded to SFMC’s claim that there are no material facts in dispute and no genuine issue for trial.
SFMC argues that summary judgment should be granted on MSH’s claim for breach of fiduciary duty by SFMC through the actions of its appointed managers on MSH’s board, namely, Bradley and Wester. SFMC argues that the obligations and duties of its appointed managers were defined by the Operating Agreement, which specifically protected SFMC as a competitor and thereby eliminated any fiduciary duty owed by its appointed managers regarding competition between the two entities. SFMC refers specifically to § 6.12(b) of the Operating Agreement, which exempted SFMC from the prohibition against members having a financial interest in a competing entity in Ouachita Parish while a member and for one year following termination. SFMC also cites La. R.S. 12:1815, which states:
A. Subject to Subsection B of this Section, the articles of organization or a written operating agreement may:
(1) Eliminate or limit the personal liability of a member or members, if management is reserved to the members, or a manager or managers, if management is vested in one or more managers pursuant to R.S. 12:1312, for monetary damages for breach of any duty provided for in R.S. 12:1314.
(2) Provide for indemnification of a member or members, or a manager or managers, for judgments, settlements, penalties, fines, or expenses incurred because he is or was a member or manager.
(B) No provision permitted under Subsection A shall limit or eliminate the liability of a member or manager for the amount of a | ^financial benefit received by a member or manager to which he is not entitled or for an intentional violation of a criminal law.
While the Operating Agreement did exempt SFMC from the noncompete provision, it did not mention an exemption from the fiduciary duty by its appointed managers on the board nor did it expressly eliminate liability for monetary damages for a breach of duty as allowed by the above quoted provision. The record indicates that one reason the provision exempting SFMC was included was that it held a preexisting interest in another competing entity, P & S Surgical Hospital in Monroe. Under La. R.S. 12:1314(A)(1), managing members are “deemed to stand in a fiduciary relationship to the limited liability company and its members[.]” Moreover, La. R.S. 12:1314(D) states, in relevant part:
D. A member or manager who makes a business judgment in good faith fulfills the duly of diligence, care, judgment, and skill under Subsection A of this Section if the member or manager:
*1249 (1) Does not have a conflict of interest with respect to the subject of the business judgment.
Clearly, there was a conflict of interest between SFMC and MSH regarding the acquisition of NMMC. At the very least, Wester was aware of this conflict and was actively working to acquire NMMC for SFMC while he and Bradley voted against MSH’s efforts to partner with HPA to acquire NMMC. In her deposition, Bradley agreed that she would have had a duty to abstain from voting on the HPA deals if she had known that SFMC was also actively negotiating for the purchase of NMMC. The time line of relevant events set forth infra demonstrates that there are genuine issues of material fact as to whether Wes-ter and Bradley, as SFMC’s appointed | ^managers on MSH’s board, breached any fiduciary duty owed to MSH. We find that the trial court’s denial of summary judgment on the claim for breach of fiduciary duty was proper.
With regard to the antitrust claim and the unfair trade practices claims subsumed therein, SFMC argues that summary judgment should be granted because MSH will be unable to prove causation. Absent proof of causation of some antitrust injury, SFMC argues that MSH lacks standing to bring any of its claims.
Louisiana’s antitrust statute provides that “[ejvery contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal.” La. R.S. 51:122. The parties appear to agree that this matter involves “vertical restraint,” meaning the restraint is imposed by persons at different levels of distribution, typically with one party being higher in the distribution chain than the other. Van Hoose v. Gravois, 2011-0976 (La.App.1st Cir.7/7/11), 70 So.3d 1017, citing Plaquemine Marine, Inc. v. Mercury Marine, 2003-1036 (La.App.1st Cir.7/25/03), 859 So.2d 110, 118. An allegation of a vertical conspiracy requires the plaintiff to show that the restraint of trade violates the “rule of reason.” Id. Under the rule of reason analysis, there are three elements to the restraint of trade claim: (1) the defendant engaged in a conspiracy; (2) that restrained trade; and (3) in a particularized market. Abraham v. Richland Parish Hosp. Service Dist. 1-B, p. 13, 938 So.2d 1163, 1172 (La.App. 2 Cir.2006); Van Hoose, supra. To prevail under the rule of reason analysis, “a plaintiff must show that the defendants’ conduct has an adverse effect on competition.” Van Hoose, p. 8, 70 So.3d at 1022, citing Red Diamond Supply, Inc. v. Liquid Carbonic Corp., 637 F.2d 1001, 1005 (5th Cir.1981), cert. denied, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981).
The record indicates that the parties agree on the particularized market at issue, namely, the acute care full-service hospital market in a 50-mile radius around SFMC’s downtown Monroe location. From our review of the evidence submitted in support of and in opposition to the motion for summary judgment, we easily find there to be a genuine issue of material fact as to whether SFMC engaged in a conspiracy with its appointed managers on MSH’s board to thwart, delay, or hinder MSH’s plans with HPA. The facts related in this opinion raise issues concerning the reasonableness of SFMC’s actions and the motives, intent, and knowledge of it and its appointed managers to MSH’s board with regard to MSH’s plans with HPA to acquire NMMC and then to expand to a full-service hospital once SFMC acquired NMMC. The facts show that Wester and / or Bradley participated in the MSH’s board’s votes on the Letters of Intent with HPA in July 2005 and voted no to the proposals. SFMC’s legal counsel sent letters objecting to the actions taken by MSH’s board and demanding rescission of *1250 those actions. All the while SFMC, with Wester’s active participation in spearheading its efforts, was working to acquire NMMC for itself. These facts and circumstances are such that raise issues that are not appropriate for summary judgment.
We also find there to be genuine issues of material fact as to whether SFMC’s actions “restrained trade” by hindering or blocking MSH’s efforts 12sto enter and compete in the full-service hospital market and by limiting that market.
SFMC urges that summary judgment must be granted because MSH will simply be unable to prove causation. They assert that MSH will be unable to show that “but for” SFMC’s actions it and HPA would have acquired NMMC from HCA. SFMC refers to deposition testimony from Greg Gerken of HCA as evidence that HPA’s bid would not have met HCA’s requirements. However, our review of Gerken’s deposition does not show it to be as definitive as portrayed by SFMC and does not foreclose proof of causation by MSH, though we recognize the difficulty of this burden. Both parties’ experts, as noted by the trial court, agree on some issues and differ on others. The expert opinions go to the heart of the causation issue. Thus, we agree with the trial court that summary judgment is not appropriate on MSH’s antitrust claim.
Because we find that SFMC is not entitled to summary judgment as a matter of law on the antitrust claim, we likewise find that it is not entitled to summary judgment on MSH’s unfair trade practices claim. La. R.S. 51:1405(A) provides that “[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” LUTPA does not define the acts which constitute unfair or deceptive practices. These are determined on a case-by-case basis. Nursing Enterprises, Inc. v. Mary, 30,776 (La.App.2d Cir.8/19/98), 719 So.2d 524. But generally, acts which constitute unfair trade practices involve fraud, deception, misrepresentation, breach of fiduciary 12<)duty, or other unethical conduct. Action Revenue Recovery, L.L.C. v. eBusiness Group, L.L.C., 44,607 (La.App.2d Cir.8/19/09), 17 So.3d 999. A critical factor in such claims is the defendant’s motivation, and the actions must have been taken for the purpose of harming the competition. Nursing Enterprises, supra. The same reasons for which summary judgment is not proper on the antitrust claim apply here.
Our review of this voluminous record under the time constraints mandated by the legislature for rendering an opinion under La. R.S. 51:135, convinces us that there are genuine issues of material fact and that SFMC is not entitled to summary judgment as a matter of law notwithstanding its well-argued positions. The facts we have outlined in this opinion raise significant questions regarding the conduct of SFMC in relation to MSH’s endeavors with HPA.
CONCLUSION
For the reasons stated in this opinion, we affirm the trial court’s judgment denying the exception of no right of action and the motion for summary judgment filed by the defendants, St. Francis Medical Center, Inc., et al. For the same reasons, we also deny the defendants’ writ application, which was consolidated with this appeal. Costs of appeal are assessed to the defendants, and the matter is remanded for further proceedings consistent with this opinion.
WRIT DENIED.
AFFIRMED AND REMANDED.

. SFMC purchased "Class C” units and "Class B” units and had one manager designated under each class.

. The record indicates that individual claims against Wester, Bradley, and another defendant, Redfield Bryan, were dismissed by the plaintiffs.

. Dave Cattar was initially designated by SFMC as its other manager on MSH’s board, but it appears from the record that he was generally absent from the board meetings. Wester was later appointed in Cattar’s place.

. SFMC referred to its attempts to acquire NMMC as "Project Longitude.”

. These emails appear to deal with SFMC’s engagement agreement with Shattuck Hammond and fee negotiations for the work to acquire NMMC.

. It is not clear whether this is in reference to SFMC's initial bids for NMMC earlier in the year or its deal with Capella.

. The record indicates that by 2008, HPA was in bankruptcy. MSH continues to operate.

. La. R.S. 51:134 states:
In all cases under this Part the defendant shall file all exceptions in limine litis, or if necessary in the alternative, after the usual delays, and any additional delays as the court may allow; however, a plea to the jurisdiction is not waived by other pleas or exceptions filed. The judge shall take up such exceptions in preference over all other business and shall decide all questions raised in the exceptions within ten days after submission, and his ruling shall have the effect of res judicata, unless the party cast shall appeal within five days. The appeal is returnable within 40 days. If the exceptions are overruled by final judgments of the appellate court, the defendant shall file his answer covering all questions of controverted fact within 15 days, and the case may be set for trial on the application of either party, which case the judge shall consider in preference over all other business. La. R.S. 51:135 states:
All interlocutory judgments in the cases affected by this Part, and not otherwise provided for, shall be appealable within five days and shall be heard and determined within twenty days after appeal is lodged, and any interlocutory judgments not appealed, except those rendered during the progress of the trial, shall be final, and shall not be reopened on final appeal. Such appeals shall be on the *1246 original papers, on the order of the district judge, if a transcript cannot be prepared in time.

. We note that the record on appeal includes 17 volumes.

. The parties have not argued that the July 5, 2005, Letter of Intent is ambiguous, and we do not find it to be so for purposes of this exception of no right of action.

. In Abraham, supra, we noted that summary judgment is particularly favored in antitrust cases due to “the concern that protracted litigation will chill pro-competitive market forces.” PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101 (2nd Cir.2002). That concern is not present here where the matter has been pending since 2006 and where it was mentioned at oral argument that SFMC filed the motion for summary judgment a mere two months before this matter was set for trial.